JOSEPH M. COLLINS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 69165, 69166. Filed June 27, 1960.

*Richard Z. Steinhaus, Esq.,* and *Nathan Goodman, Esq.,* for the petitioner.

*John J. O'Toole, Esq.,* for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in income tax of petitioner as follows:

| Docket No. | Year | Deficiency |
|---|---|---|
| 69165 | 1945 | $6,170.46 |
| | 1947 | 44,975.84 |
| 69166 | 1948 | 56,259.14 |
| | 1949 | 47,271.48 |
| | 1950 | 25,389.86 |
| | 1951 | 101,821.04 |
| | 1952 | 153,360.56 |

The only issue is whether respondent properly disallowed losses in excess of $50,000 incurred by petitioner in the operation of professional football teams during each of the years 1947 to 1951, inclusive, under section 130, I.R.C. 1939.[1]

FINDINGS OF FACT.

The stipulated facts are so found.

Joseph M. Collins, also known as Ted Collins and hereafter referred to as petitioner, is an individual who resided in New York, New York, during the taxable years involved. Petitioner filed his individual income tax returns on a cash and calendar year basis with the collector or district director of internal revenue for the Upper Manhattan District of New York.

For many years petitioner has been connected with the field of sports as owner of professional football and basketball teams and has also been a radio and television producer. During the taxable years 1943 through 1948, petitioner owned and operated the Boston Yanks, a member of the National Football League, the franchise for which he had paid $50,000. The Yanks played their home

---

[1] The year 1945 is involved because of a net operating loss carryback from 1947 and the year 1952 involves a net operating loss carryover from prior years.

games at Fenway Park in Boston, having a seating capacity of 38,000, during these years. Partly as a result of the competition provided by five college football teams and dozens of high school teams playing in the Boston area, attendance at the Yanks' home games was consistently poor. Petitioner incurred losses in operating the club of $151,113.30 in 1947 and $173,299.88 in 1948.

By the end of the 1948 season petitioner concluded that there was little possibility of operating the Yanks at a profit. Accordingly, after the final game of the season he announced to the press that he had decided to dispose of or discontinue the club. When petitioner advised the commissioner of the National Football League of his intention of giving up the club, the commissioner asked him to delay the formal announcement to the league until the meeting of the league's executive committee on January 21, 1949, in Chicago. Prior to that meeting the other club owners urged petitioner to continue. Nevertheless, at the league meeting the Boston Yanks' franchise was canceled upon petitioner's motion.

During the same meeting following the cancellation of the Boston franchise, the club owners approached petitioner with a plan to award him a franchise to operate a club in New York City. The club owners wished to have a second club in New York in addition to the New York Giants so that there would be a professional football game in New York each Sunday of the season. Petitioner was favorably inclined as New York was his home and he felt the chances of operating profitably in New York were considerably brighter than in Boston. At this same meeting the executive committee granted petitioner a franchise to operate in New York City beginning with the 1949 season. The New York franchise was granted to petitioner without charge by the league but petitioner was required to pay the Giants $25,000 per year for territorial rights to play in New York. Thereafter during the meeting petitioner employed a new coach for the New York team and participated in the player draft, having first choice as a new team.

Petitioner named his New York team the Bulldogs. They played their home games at the Polo Grounds in New York City, which had a seating capacity of 55,000. Although petitioner sought to develop a large following for the Bulldogs by means of an extensive publicity campaign, they incurred a loss of $252,732.25 during the first season, and the club went out of existence late in 1949.

The New York Yanks were organized by petitioner in late 1949 and subsequent thereto their home games were played in Yankee Stadium, with a seating capacity of 70,000.

Petitioner then operated the New York Yanks for two seasons, 1950 and 1951, at losses of $225,870.90 and $195,211.42, respectively. Following the conclusion of the 1951 season the league bought peti-

tioner's franchise and sold it to Dallas. Petitioner has not owned a National Football League franchise since that time.

The National Football League consists of 12 teams organized into 2 divisions of 6 teams each. The league awards a franchise only upon the unanimous approval of all club owners. Only two franchise changes have been made by the league since the cancellation of the Boston Yanks' franchise in 1949. It is not necessary to have a franchise canceled and a new franchise issued in order to move a National Football League team from one city to another.

None of the contracts of the Boston Yanks players for the 1948 season carried over to the 1949 season. Player contracts are normally for a period of 1 year although they can be made for a period of more than 1 year, and often contain option clauses for the next year. When the Boston franchise was canceled in January 1949, the Boston Yanks players became free agents. Some of the Boston players were invited to try out with the New York Bulldogs and 16 players were signed for the 1949 season. Several others played for other teams in 1949. In January 1949, the Bulldogs obtained 43 new players in the National Football League player draft. New contracts with the New York Bulldogs were signed by all the players.

Petitioner did not handle the financial management of any of the three teams and had little to do with the actual management of the teams. His general manager for the Boston Yanks was Arthur G. Sampson. His general manager for the New York Bulldogs and later for the New York Yanks was Frank J. Fitzgerald. The coaching staffs and the front office personnel for each of the three clubs were entirely different. The main offices of the three football teams were at different locations.

The bank account for the Boston Yanks was maintained at the National Shawmut Bank in Boston. The bank account for the New York Bulldogs and later for the New York Yanks was maintained at the Manufacturers Trust Company in New York City.

Public relations and publicity were handled by different firms for each of the three football teams. The books and records for each football team were individually kept and were independent of each other having no relationship to each other whatsoever. All of the office furnishings and equipment of the Boston Yanks were sold and all bills were paid from the Boston Yanks' bank account before the books of the Boston Yanks were closed.

On July 1, 1944, the Boston Yanks filed with the city clerk of Boston a certificate of registry of doing business under an assumed name pursuant to Massachusetts law. On February 9, 1949, the New York Bulldogs filed a county clerk's certificate of registry of doing business under an assumed name pursuant to New York law.

On April 17, 1950, the New York Bulldogs filed a certificate of discontinuance of doing business under an assumed name and on the same date the New York Yanks filed a county clerk's certificate of registry of doing business under an assumed name.

The losses disallowed by respondent are as follows:

| Year | Loss disallowed |
|---|---|
| 1945 | [1] $6,707.02 |
| 1947 | 96,593.10 |
| 1948 | 116,789.39 |
| 1949 | 204,441.94 |
| 1950 | 168,400.74 |
| 1951 | 139,728.41 |
| 1952 | [2] 179,268.37 |

[1] Carryback loss from year 1947.
[2] Carryover loss from years 1949, 1950, and 1951.

### ULTIMATE FINDINGS.

There was no business connection, economic, physical, or otherwise, between the Boston Yanks and the New York Bulldogs. Each of these teams was operated as a separate and independent business.

Petitioner has stipulated and it is so found that petitioner's returns for the years 1948 through 1952 were single returns.

### OPINION.

These losses were disallowed under section 130(a), I.R.C. 1939.[2] This section provides that an individual having deductions (other than for interest and taxes) attributable to a trade or business exceeding the gross income from that trade or business by more than $50,000 in each of 5 consecutive years, will only be allowed deductions to the extent of $50,000 in each such year. In the applicable regulations [3] respondent states that each trade or business of an in-

---

[2] SEC. 130. LIMITATION ON DEDUCTIONS ALLOWABLE TO INDIVIDUALS IN CERTAIN CASES.

(a) RECOMPUTATION OF NET INCOME.—If the deductions (other than taxes and interest) allowable to an individual (except for the provisions of this section) and attributable to a trade or business carried on by him for five consecutive taxable years have, in each of such years, exceeded by more than $50,000 the gross income derived from such trade or business, the net income of such individual for each of such years shall be recomputed. For the purpose of such recomputation in the case of any such taxable year, such deductions shall be allowed only to the extent of $50,000 plus the gross income attributable to such trade or business, except that the net operating loss deduction, to the extent attributable to such trade or business, shall not be allowed.

[3] Regulations 111.

SEC. 29.130-1. LIMITATION ON DEDUCTIONS ALLOWABLE TO INDIVIDUALS IN CERTAIN CASES.—(a) *Recomputation of net income.*—* * *

\* \* \* \* \* \*

If an individual carries on several trades or businesses, the deductions attributable to such trades or businesses, and the gross income derived from such trades or businesses, shall not be aggregated in determining whether the deductions (other than those for interest and taxes) exceed the gross income derived from such trades or businesses by more than $50,000 in any taxable year. Each trade or business shall be considered separately. The trade or business carried on by the individual must be the same in each of the five consecutive taxable years in which the deductions (other than those for interest and taxes) exceed the gross income derived from such trade or business by more than $50,000.

dividual shall be considered separately for purposes of this section and that the trade or business must be the same in each of the 5 consecutive years.

Respondent argues that the three professional football teams operated by petitioner during the years 1947 to 1951, constitute a single trade or business, and since a loss of more than $50,000 was incurred in each of 5 consecutive years, section 130(a) should be applied. It is petitioner's position that each of his football teams— the Boston Yanks, the New York Bulldogs, and the New York Yanks—constituted a separate trade or business. Therefore, according to petitioner, the losses of the three clubs should not be tacked on to each other in order to form the 5-year chain of losses exceeding $50,000.

The question is, then, whether petitioner's football teams constituted one or more than one "trade or business" as that phrase is used in section 130. Unfortunately, in the decision of this question we have the benefit of scant authority. Only a single case, *Arthur V. Davis*, 29 T.C. 878, appears to be in point. Nor is the legislative history helpful in interpreting the words of the section.

In the *Davis* case, petitioner owned several large farming proprietorships. One of these—Brownsville Plantations—operated large acreage in Texas and Mexico. Another—Three Bays Farms—conducted its operations in the Bahama Islands. Respondent aggregated the losses incurred by these two farms in order to meet the requirements of section 130(a). Petitioner argued that the farms were in fact separate businesses so that their losses could not properly be aggregated. In holding for petitioner we noted that the two farms each year were engaged in different kinds of agricultural activities and that they were conducted by petitioner as two separate enterprises.

Respondent in this case seeks to distinguish the *Davis* case by noting that petitioner's three football teams were engaged in the same kind of activity whereas the farms in the *Davis* case were engaged in different activities. Further, our finding in the *Davis* case that there was no economic interrelation between the two farms is inapplicable to this case, respondent urges, because the farms were being operated at the same time whereas the football teams were operated consecutively, with one club replacing another.

Respondent's basic theory, previously advanced in the *Davis* case, is that to ascertain whether an individual operates one trade or business or several for purposes of section 130(a), we must look to the nature of the business. Under this "nature test" if two enterprises of an individual are in the same line of business, then they should be treated as a single trade or business. According to re-

spondent's view, petitioner was in the business of promoting professional football. His Boston club and his New York clubs were in the same line of business, and thus part of a single business.

We do not agree with respondent. Respondent's regulations recognize that an individual may have several separate businesses and that common ownership alone does not convert them into one business. While the fact that an individual carries on two or more enterprises which engage in identical or similar activities may be a factor suggesting that the enterprises are in reality a single trade or business, this fact may be outweighed by other considerations in a given case. In the *Davis* case we pointed out the differences in the nature of the farming activities of the two farms, but we also emphasized their separateness as economic entities. We stressed the facts that these proprietorships were operated under different managements in different countries facing different conditions as to finances, currency controls, labor, and marketing. In addition, we pointed out that separate books were kept adequately reflecting the operational results of each enterprise.

A consideration of the facts in this case indicates that the Boston Yanks and New York Bulldogs were separately and independently conducted by petitioner with no economic or other interrelation between them. Petitioner announced his intentions of terminating the Boston franchise immediately following the final game of the 1948 season, but was persuaded to take no official action until the league meeting in January 1949. The Boston venture was officially terminated by the cancellation of the franchise at the league meeting in January 1949. Petitioner testified that the cancellation of the Boston franchise had the effect of releasing all football players on the Boston roster. Some of these players subsequently tried out with petitioner's New York Bulldog club, but several players performed for other teams. All outstanding bills of the Boston Yanks were paid out of the Boston Yanks' bank account with the National Shawmut Bank in Boston. All furniture, fixtures, and equipment of the Boston Yanks were sold, and its books were closed.

Shortly after the cancellation of the Boston franchise at the league meeting in Chicago in January 1949, petitioner was persuaded to accept a franchise in New York City. He hurriedly signed a new head coach so that his new club could participate in the player draft at that meeting. A new general manager was hired. New players were employed under new contracts and all new equipment was purchased. Petitioner then retained a public relations firm to conduct a publicity campaign in New York City to attract a following for his new club. A new office was opened for the Bulldogs in New York City. An entirely different office force was hired for the New

York club. A bank account was opened for the Bulldogs at the Manufacturers Trust Company. The books and records of the Boston Yanks and the New York Bulldogs were entirely separate. The teams played their home games in different cities and under different schedules.

In our opinion these and other facts related in our Findings of Fact establish that the business activities of the Boston Yanks and the New York Bulldogs were conducted separately and independently and had no economic or other relationship to nor dependence upon each other. Consequently they should be treated as separate and distinct businesses for purposes of section 130(a). Accordingly, the operating losses incurred by the two teams cannot be tacked on to each other in order to meet the 5-consecutive-year requirement of losses exceeding $50,000.

The parties did not develop the question of whether the New York Bulldogs and New York Yanks were separate businesses, and we need not determine it here for our finding that the Boston Yanks and New York Bulldogs were separate businesses is sufficient to break the 5-year chain of losses.

*Decisions will be entered under Rule 50.*