# United States Tax Court

T.C. Memo. 2025-122

GARY M. SCHWARZ AND MARLEE SCHWARZ,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent[1]

————————

Docket No. 12347-20.　　　　　　　　Filed November 24, 2025.

————————

In *Schwarz I*, we held that TI, a partnership owned by Ps, did not engage for profit in an activity reported on Schedule F, Profit or Loss From Farming, during the years 2015–17. In our discussion of the issue, we cited Treas. Reg. §§ 1.183-1(d)(1) and 1.183-2(b) numerous times. Several months after *Schwarz I* was filed, Ps filed a Motion for Reconsideration alleging (for the first time) that Treas. Reg. §§ 1.183-1(d)(1) and 1.183-2(b) are invalid because they do not represent the best interpretation of I.R.C. § 183. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024) (stating that if an agency's interpretation "is not the best, it is not permissible"). Ps later also alleged that (1) the regulations violate the notice-and-comment requirements of the Administrative Procedure Act, *see* 5 U.S.C. § 553, and/or (2) Congress did not delegate authority to the Secretary of the Treasury to issue the regulations. We agreed to consider the validity of the regulations and/or whether the validity of the regulations would affect the outcome of this case.

*Held*: We need not address petitioners' arguments regarding the validity of Treas. Reg. §§ 1.183-1(d)(1) and

————————

[1] This Opinion supplements our previously filed opinion *Schwarz v. Commissioner* (*Schwarz I*), T.C. Memo. 2024-55.

**[*2]** 1.183-2(b). The portions of those regulations necessary to decide this case are largely based on caselaw existing at the time I.R.C. § 183 and the regulations were adopted. Applying that preexisting caselaw (and some more recent caselaw) to the facts of this case, we would still hold that TI did not engage in the Schedule F activity with the intent to make a profit.

————

*Hannah L. Templin, Margarita L. Stone, Todd R. Geremia, Justin L. Campolieta, Michael S. Coravos, Adam P. Sweet, Benjamin J. Peeler*, and *Kacie N.C. Dillon*, for petitioners.

*Matthew R. Delgado, Nga Q. Tran-Medina, Marcus R. Rhodes, Audrey Marie Morris*, and *Roberta L. Shumway*, for respondent.

## SUPPLEMENTAL MEMORANDUM OPINION

GOEKE, *Judge*: On May 13, 2024, we filed *Schwarz I*, holding that a partnership owned by petitioners, Tecomate Industries, LLC (TI), did not engage in an activity (farming activity) reported on Schedule F, Profit or Loss From Farming, for profit in the years at issue, 2015–17.[2] In our discussion of the issue, we cited Treasury Regulation §§ 1.183-1(d)(1) and 1.183-2(b) numerous times. Petitioners did not challenge the validity of those regulations before *Schwarz I* was filed. Accordingly, in *Schwarz I* we did not address whether those regulations were valid.

On June 28, 2024, the Supreme Court issued *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024). In *Loper Bright* the Supreme Court overruled *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), regarding the standard of review that courts are to employ when determining whether an agency's interpretation of a statute is permissible. *Loper Bright*, 144 S. Ct.

---

[2] We further held that petitioners were not liable for section 6662 accuracy-related penalties determined by respondent. Respondent has not challenged our holding regarding the penalties, and we will not address them further.

Unless otherwise indicated, statutory references are to the Internal Revenue Code (Code), Title 26 U.S.C., in effect at all relevant times, and regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times. Rounding adjustments have been made to many of the monetary, acreage, and percentage amounts stated herein.

**[*3]** at 2273. The Supreme Court held that if an agency's interpretation "is not the best, it is not permissible." *Id.* at 2266.

On September 16, 2024, petitioners filed a Motion for Reconsideration alleging that Treasury Regulation §§ 1.183-1(d)(1) and 1.183-2(b) are invalid in the wake of *Loper Bright*. Petitioners requested that we "reconsider [our] holding that [TI] did not engage in [a] section 183 for-profit activity by interpreting the law instead of deferring to" the regulations. On November 1, 2024, respondent filed a Response in which he objected to the granting of petitioners' Motion for Reconsideration on several grounds. On November 5, 2024, we issued an Order granting petitioners' Motion for Reconsideration "insomuch that the Court will reconsider" *Schwarz I*. We ordered the parties to file responses addressing, among other things, (1) relevant caselaw; (2) authority delegated by Congress to the Secretary of the Treasury (Secretary) to issue regulations regarding section 183; (3) the history of the regulations at issue; (4) if any portion of the regulations is "found to be invalid, how the Court should evaluate the facts of this case and whether there would be any effect on the outcome"; and (5) "[a]ny other issues, law, and/or facts the parties believe are relevant." After several extensions of time, the parties filed their Responses on June 27, 2025 (Responses).[3]

Considering the parties' Responses and the relevant facts and law, we conclude that, even if Treasury Regulation §§ 1.183-1(d)(1) and 1.183-2(b) were held to be invalid, TI's farming activity was not engaged in for profit in the years at issue. Accordingly, we will not address the validity of those regulations in this Supplemental Memorandum Opinion.

---

[3] Motions for Leave to File Amicus Brief were filed on July 9, 2025 (by the National Foreign Trade Council, Inc. (NFTC)), and July 11, 2025 (by the Chamber of Commerce of the United States of America (USCC)). Amicus Briefs lodged with those motions pertain to issues regarding the validity of regulations in the wake of *Loper Bright*. We will not address the validity of Treasury Regulation §§ 1.183-1(d)(1) and 1.183-2(b) in this Supplemental Memorandum Opinion because the holding of *Schwarz I* would not change even if the regulations were invalid. Accordingly, we do not find the lodged Amicus Briefs helpful in the resolution of this case and will issue Orders denying the Motions for Leave to File Amicus Brief. *See Trump Vill. Section 3, Inc. v. Commissioner*, T.C. Memo. 1995-281, 1995 Tax Ct. Memo LEXIS 282, at *2. However, we thank the NFTC and the USCC for their efforts.

**[\*4]** *Background*

We adopt the findings of fact set forth in *Schwarz I*, repeating such facts only as necessary for clarity and convenience.

*Discussion*

## I.   *Burden of Proof*

Generally, taxpayers bear the burden of proving, by a preponderance of the evidence, that the Commissioner's determinations are incorrect. *Welch v. Helvering*, 290 U.S. 111, 115 (1933). In certain circumstances, the burden of proof with respect to any factual issue may be shifted to the Commissioner. § 7491(a). The parties disagree whether petitioners have met the statutory requirements to shift the burden of proof to respondent. However, because we decide all issues on the preponderance of the evidence, we need not decide which party bears the burden of proof. *See Knudsen v. Commissioner*, 131 T.C. 185, 189 (2008), *supplementing* T.C. Memo. 2007-340.

## II.   *Issues with Mr. Swanson's Expert Report*

Petitioners argue that property value appreciation should be considered in determining whether TI's farming activity was engaged in for profit in the years at issue. Merrill Swanson acted as a property valuation expert for petitioners. In two expert reports Mr. Swanson determined valuations as of October 31, 2022, for (1) the La Perla HQ Tract and (2) the Lone-Star Tract and Jalisco Ranch.[4] In *Schwarz I* we did "not determine whether Mr. Swanson's [property] valuations are accurate," because we ruled that petitioners'/Affiliated Entities'[5] real estate activities and TI's farming activity were separate activities, and the property valuations were therefore irrelevant. *Schwarz I*, T.C. Memo. 2024-55, at \*60–61. However, in support of an alternative position discussed in this Supplemental Memorandum Opinion, *see infra Discussion* Part VII, we will address issues with the valuations

---

[4] *See Schwarz I*, T.C. Memo. 2024-55, at \*61, for a description of the acreage making up the La Perla HQ Tract and the Lone-Star Tract. The La Perla HQ Tract was only a portion of La Perla Ranch.

[5] As defined in *Schwarz I*, T.C. Memo. 2024-55, at \*11, "Affiliated Entities" are entities partially or wholly owned by petitioners. Although TI was owned by petitioners, it is not included in the term "Affiliated Entities." *Id.* at \*13.

[*5] that Mr. Swanson determined for the La Perla HQ Tract and Jalisco Ranch.

In one report, Mr. Swanson determined that the value of the La Perla HQ Tract was $9,347,000 ($7,614 per acre), comprising (1) underlying land worth $3,392,000, (2) major water features (La Perla Lake, forage ponds, and Waterworld) worth $3,392,000, (3) irrigation systems worth $107,000, (4) "above standard improvements" worth $1,840,000, and (5) associated water rights worth $616,000.

In another report, Mr. Swanson valued Jalisco Ranch and the Lone-Star Tract separately. Mr. Swanson determined that the value of Jalisco Ranch was $4,765,000 ($5,941 per acre), comprising (1) underlying land worth $2,199,000, (2) major water features (Jalisco Lake and forage ponds) worth $2.2 million, (3) irrigation systems worth $126,000, and (4) associated water rights worth $240,000.

Considering the record in this case,[6] we find that Mr. Swanson (1) overvalued the major water features on the La Perla HQ Tract and Jalisco Ranch and (2) overvalued the underlying land of the La Perla HQ Tract and Jalisco Ranch. We will discuss these issues separately.

A.      *Overvaluing Major Water Features*

Mr. Swanson determined that the large lakes and forage ponds (as well as associated lake infrastructure) on the La Perla HQ Tract and Jalisco Ranch were major water features that doubled the value of the underlying land of each property.[7] This determination was based on nine "case studies" that Mr. Swanson created for his reports. Each case

---

[6] The fair market value of property on a given date is a question of fact to be resolved on the basis of the entire record. *McGuire v. Commissioner*, 44 T.C. 801, 806–07 (1965); *Kaplan v. Commissioner*, 43 T.C. 663, 665 (1965). We evaluate expert witnesses' opinions in the light of their qualifications and the evidence in the record, and we may accept an "opinion in toto or accept aspects . . . that we find reliable." *Oconee Landing Prop., LLC v. Commissioner*, T.C. Memo. 2024-25, at *58, *supplemented by* T.C. Memo. 2024-73; *see also Savannah Shoals, LLC v. Commissioner*, T.C. Memo. 2024-35, at *35. We also "may determine fair market value on the basis of our own examination of the evidence in the record." *Savannah Shoals*, T.C. Memo. 2024-35, at *35; *accord Buckelew Farm, LLC v. Commissioner*, T.C. Memo. 2024-52, at *51, *aff'd*, No. 24-13268, 2025 WL 2502669 (11th Cir. Sept. 2, 2025).

[7] Although the 6-acre House Lake sits on the La Perla HQ Tract, Mr. Swanson did not deem House Lake to be one of the major water features on the La Perla HQ Tract. Although the 18-acre Trophy Lake sits on the 1,000-acre Lone-Star Tract, Mr. Swanson did not deem Trophy Lake to be a major water feature and thus found that the Lone-Star Tract had no major water feature.

**[\*6]** study comprised a pair of sales, "one recreational property with a sizeable lake" or other major water feature(s) (major water feature property)[8] and the other "a typical standard ranch for the [same] area" without a major water feature. Mr. Swanson used the same nine case studies in his valuations for both the La Perla HQ Tract and Jalisco Ranch major water features. The properties used in the nine case studies were different from the properties used as comparables to value the underlying land of the La Perla HQ Tract and Jalisco Ranch.

For each case study pair, Mr. Swanson adjusted sale prices and compared them.[9] For each pair, the major water feature property sold for a higher adjusted price. Mr. Swanson considered the higher adjusted sale prices for major water feature properties to be attributable to the major water features. He concluded that a major water feature nearly doubles the value of underlying land. The following table shows Mr. Swanson's results:

| Case Study Pair No. | "Concluded Premium for [Major Water Feature] Properties" |
|---------------------|---------------------------|
| 1 | 1.99 |
| 2 | 1.44 |
| 3 | 2.20 |
| 4 | 2.14 |
| 5 | 2.55 |
| 6 | 2.86 |
| 7 | 1.70 |
| 8 | 1.38 |
| 9 | 1.39 |
| Average | 1.96 |
| Median | 1.99 |

---

[8] Not every major water feature property had a lake; Mr. Swanson stated that one major water feature property had only "rural water service available and eighteen stock tanks (some are sizable)."

[9] Mr. Swanson adjusted sale prices for features other than water features, such as physical features, recreational appeal, size, and various improvements.

**[\*7]**    Mr. Swanson then considered "the size, depth and condition of the" lakes and forage ponds on the La Perla HQ Tract and Jalisco Ranch "and the South Texas location of the ranch[es]." He concluded that the lakes and forage ponds were major water features and "that an appropriate multiple to be applied to the value of the underlying land is near the middle of the [case study] range or 2.0."

While all the case study properties were in Texas, none of the properties were in Zapata County or adjacent counties.[10] The case study 1 properties are in Medina County (approximately 150 miles from Zapata County), and properties in the remaining eight case studies are approximately 250–450 miles away. Of the nine case studies, three involve properties near Dallas, Texas, two involve properties near Houston, Texas, and two more involve properties near College Station, Texas. We take judicial notice that Texas is a large state with distinctive weather/precipitation patterns in different regions. Although Mr. Swanson stated that he considered "the South Texas location of" the La Perla HQ Tract and Jalisco Ranch, there is little to no analysis regarding whether the value of a large lake on a property in Zapata County (where, as Mr. Schwarz testified, drought is "not an act of God; that's where we live") might be different from that of a similar lake on a similarly sized property in a wetter region.

In addition to location issues, most of the case study major water feature properties have water features that cover a significantly higher percentage of land than the major water features on the La Perla HQ Tract and Jalisco Ranch.[11] The major water feature properties in case studies 3, 4, 5, 6, and 9 were about 90%, 70%, 20%, 29%, and 58% covered by water, respectively. Conversely, the large lakes and forage ponds cover only 8.7% of the La Perla HQ Tract and 10.7% of Jalisco Ranch. The major water feature properties in case studies 1, 7, and 8 all appear to be about 10% covered by water and are better comparables. It is unclear how much of the major water feature property in case study 2 is covered by water; Mr. Swanson only noted that the property had "rural water service available and eighteen stock tanks (some are sizable)."

In valuing the major water features on the La Perla HQ Tract and Jalisco Ranch, Mr. Swanson focused entirely on case studies involving properties of questionable comparability. He did not consider the

---

[10] We take judicial notice of the location of the counties in Texas.

[11] Mr. Swanson acknowledged in his testimony that he focused on surface area of water features because characteristics such as depth are often difficult to obtain.

[*8] December 2019 Twin Lakes South and Twin Lakes North sales, which we find to be highly relevant. Lone Star La Perla, LP (LSLP), sold Twin Lakes South and Twin Lakes North to different buyers. Twin Lakes South (501 acres) sold for $2,250 per acre, and Twin Lakes North (861 acres) sold for $2,150 per acre. Mr. Swanson used these sales as two comparable property sales to value the underlying land of both the La Perla HQ Tract and Jalisco Ranch in his reports. Mr. Swanson recognized that Twin Lakes South has a "±30 surface acre lake" with a "notable fish habitat," while Twin Lakes North has only a 3-acre stock tank. However, Mr. Swanson did not identify Twin Lakes South as a major water feature property and did not use the Twin Lakes South and Twin Lakes North sales as a pair in his water feature case studies.

Twin Lakes South is contiguous to the La Perla HQ Tract and close to Jalisco Ranch, while Twin Lakes North is contiguous to Twin Lakes South and close to both the La Perla HQ Tract and Jalisco Ranch. TI completed work on the lake on Twin Lakes South,[12] as well as the large lakes and forage ponds on the La Perla HQ Tract and Jalisco Ranch. While the 6% water-to-land ratio on Twin Lakes South is smaller than the 8.7% and 10.7% ratios on the La Perla HQ Tract and Jalisco Ranch, respectively, the percentage is closer than those of most of the major water feature properties in the case studies. And although the lake on Twin Lakes South has a surface area of only 30 acres, Mr. Swanson's reports acknowledge that lakes as small as 7 acres can help to designate a property as a major water feature property; the size of a lake is less important than the percentage of the property covered by water.

Mr. Swanson testified that "the lake on the Twin Lakes South is muddy, and it's a problem, and so the lake value is somewhat discounted on that [sale] because it's muddy, it's not clear like the lakes on La Perla." However, Mr. Jones (the fisheries expert who advised TI) noted "[w]ater clarity" issues and poor visibility in Jalisco and La Perla Lakes in documents he prepared during 2016 and 2017. Mr. Jones also testified at trial that "any muddy lake can be cleared within a few hours to two days" using gypsum, which he previously used to improve the clarity of La Perla Lake (and presumably of Jalisco Lake as well). There is no

---

[12] An invoice issued by TI shows significant work by TI to expand the lake on Twin Lakes South in 2012. Another invoice shows work by TI to "[d]eepen [the] Twin Lakes South" lake in 2019.

**[*9]** indication that the mud in the lake on Twin Lakes South is of concern or sets it apart from Jalisco and La Perla Lakes.

Considering property locations, known lake attributes, the ratio of water to land, and the fact that TI improved the lake on Twin Lakes South, we find (1) the lake on Twin Lakes South to be a major water feature and (2) the pair of Twin Lakes Ranch sales to be more relevant than any of the paired case study property sales in determining the value of the major water features on the La Perla HQ Tract and Jalisco Ranch. We must next (1) analyze the value of the lake on Twin Lakes South and (2) consider that value, as well as the case studies, to determine appropriate property valuation adjustments for the major water features on the La Perla HQ Tract and Jalisco Ranch.

As part of our analysis of the value of the lake on Twin Lakes South, we turn to the sections of Mr. Swanson's reports regarding comparable sales for underlying *land* valuations. As shown in the tables *infra* this *Discussion* Part II.A, Mr. Swanson determined the valuation of underlying land by attempting to neutralize differing property features. One of the property features that he attempted to neutralize was water features other than major water features (minor water features).[13] When comparing sold properties to Jalisco Ranch, Mr. Swanson noted that Jalisco Ranch had a "3[-inch] waterline from Loop Road with wildlife waterings" minor water feature. With respect to Twin Lakes South, Mr. Swanson noted a "±30 surface acre lake (muddy)," but adjusted the sale price per acre of Twin Lakes South down only 10% considering this (allegedly) minor water feature that he found to be superior to the minor water feature(s) noted with respect to Jalisco Ranch.[14] With respect to Twin Lakes North, Mr. Swanson noted a "±3 surface acre stock tank" and adjusted the sale price per acre of Twin Lakes North down 5%. These adjustments are shown in the following table from Mr. Swanson's relevant report:

---

[13] Mr. Swanson considered the valuation of underlying land and the valuation of major water features in separate sections of his reports. Accordingly, he did not make adjustments regarding the major water features in the sections of his reports pertaining to underlying land valuations.

[14] Because Mr. Swanson was valuing land, and water features increase sale prices, superior water features on comparable properties appropriately resulted in a negative adjustment to comparable property sale price per acre, while inferior water features resulted in a positive adjustment.

[*10]

| Item | Subject Property | 1 — Bell Ranch | Adj. | 2 — Badger Capital Partners, LP | Adj. | 3 — Mt Cancion Ranch | Adj. | 4 — Twin Lakes South | Adj. | 5 — Twin Lakes North | Adj. | 6 — Myers Ranch | Adj. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sale No. | | 1 | | 2 | | 3 | | 4 | | 5 | | 6 | |
| Ranch | Subject Property | Bell Ranch | | Badger Capital Partners, LP | | Mt Cancion Ranch | | Twin Lakes South | | Twin Lakes North | | Myers Ranch | |
| Sale Price | | $1,500,000 | | $2,097,000 | | $2,000,000 | | $1,126,800 | | $1,851,150 | | $3,699,000 | |
| Price/Acre | | $1,316 | | $2,094 | | $1,818 | | $2,250 | | $2,150 | | $3,329 | |
| Minerals | Surface only. | Surface only. | $0 | Surface only. | $0 | Surface only. | $0 | Surface only. | $0 | Surface only. | $0 | Surface only. | $0 |
| Financing & Condition of Sale | N/A | Cash to seller; arm's length | $0 | Cash to seller; arm's length. | $0 | Cash to seller; arm's length. | $0 | Cash to seller; arms length. | $0 | Cash to seller; arms length. | $0 | For sale | ($500) |
| Water Rights | 200 acre feet of multi-use purposes. (ECV of Class B water rights – $240,000 or $299/acre) | None. | $299 | 9.1 acre feet of Class B Water rights out of the Rio Grande River. CV $11/Ac. | $288 | None. | $299 | 1.11 acre feet of water rights for irrigation purposes, 2.46 acre feet of water rights for mining purposes & 16.4 acre feet of water rights for multi-use purposes. CV $48/ac. | $251 | 1.89 acre feet of water rights for irrigation purposes & 4.424 acre feet of water rights for mining purposes. CV $9/ac. | $290 | 1.89 acre feet of water rights for irrigation purposes & 4.424 acre feet of water rights for mining purposes. CV $9/ac. | $290 |
| Improvements | Jalisco Lake Infrastructure – $330,000 or $411 per acre. Considered with lake and separately from land. | None of value | $411 | Doublewide manufactured home, barn w/ a walk-in cooler, game-cleaning area, etc., guest house, various other sheds and outbuildings, etc. ECV $100,000 or $100/Ac. | $311 | Ranch house, bunkhouse, two barns, various other sheds and outbuildings, etc. ECV $300,000 or $273/Ac. | $138 | None of value. | $411 | None of value. | $411 | 5-6 bedroom/3.5 bathroom Ranch House and Casita (ECV – $450,000, or $405/acre) | $6 |
| Personal Property | Two pivot irrigation systems – CV $126,000 or $157/acre | N/A | $157 | N/A | $157 | N/A | $157 | N/A | $157 | N/A | $157 | N/A | $157 |
| Date of Sale | Mar-21 | Dec-20 | $147 | Jul-20 | $268 | Dec-19 | $283 | Dec-19 | $450 | Dec-19 | $422 | Current | $0 |
| ADJUSTED PRICE / ACRE | | | $2,330 | | $3,118 | | $2,695 | | $3,519 | | $3,430 | | $3,282 |
| **Adjustments** | | | | | | | | | | | | | |
| Location & Access | Zapata County; easement access off U.S. Highway 83; 14.1 miles NE of San Ygnacio; ±32.0 miles S of Laredo. | Zapata County; easement access off State Highway 16; 15.0 miles W of Randado; ±18.0 miles S of Zapata. | 0.0% | Zapata County; easement access off U.S. Highway 83; 14.2 miles NE of San Ygnacio. | 0.0% | Zapata County; easement access off State Highway 16; 15.0 miles W of Randado; ±25.0 miles NE of Zapata. | 0.0% | Zapata County; easement access off U.S. Highway 83; 14.0 miles NE of San Ygnacio. | 0.0% | Zapata County; easement access off U.S. Highway 83; 14.0 miles NE of San Ygnacio. | 0.0% | Zapata County; easement access off U.S. Highway 83; 14.0 miles NE of San Ygnacio. | 0.0% |
| Size | 802.000 | 1,139.680 | 15% | 1,001.300 | 0.0% | 1,100.000 | 10% | 500.800 | 0.0% | 661.000 | 0.0% | 1,111.000 | 0.0% |
| Land Features | Mostly level to gently rolling terrain with some rolling gravel hills; mostly native pasture with a good cover of mid to high canopy trees and underbrush in the deeper soils and low to mid canopy brush in the shallower soil areas; ±48 acres of pivot irrigated fields (2 fields); good infrastructure and condition; good fencing, etc.; <5% floodplain. | Mostly level to gently rolling terrain with some rolling gravel hills; mostly native pasture with a good cover of mid to high canopy trees and underbrush in the deeper soils and low to mid canopy brush in the shallower soil areas; average interior road system; average fencing, etc.; no floodplain. | 15% | Mostly level to gently rolling terrain with some rolling gravel hills; mostly native pasture with a good cover of mid to high canopy trees and underbrush in the deeper soils and low to mid canopy brush in the shallower soil areas; average to good infrastructure and condition; good interior road system; good fencing, etc.; 10% floodplain. No food plots. | 5% | Mostly level to gently rolling terrain with some rolling gravel hills; mostly native pasture with a good cover of mid to high canopy trees and underbrush in the deeper soils and low to mid canopy brush in the shallower soil areas; some selectively cleared areas (strips; senderos; food plots; etc.); standard infrastructure and condition; no floodplain. | 5% | Mostly level to gently rolling terrain with some rolling gravel hills; mostly native pasture with a good cover of mid to high canopy trees and underbrush in the deeper soils and low to mid canopy brush in the shallower soil areas; average to good infrastructure and condition; average to good infrastructure; good interior road system; good fencing, etc.; limited floodplain. No food plots. | 5% | Mostly level to gently rolling terrain with some rolling gravel hills; mostly native pasture with a good cover of mid to high canopy trees and underbrush in the deeper soils and low to mid canopy brush in the shallower soil areas; average to good infrastructure and condition; average to good infrastructure; good interior road system; good fencing, etc.; limited floodplain. No food plots. | 5% | Mostly level to gently rolling terrain with some rolling gravel hills; mostly native pasture with a good cover of mid to high canopy trees and underbrush in the deeper soils and low to mid canopy brush in the shallower soil areas; average to good infrastructure and condition; average to good infrastructure; good interior road system; good fencing, etc.; limited floodplain. One food plot. | 2.5% |
| Water Features | 3" waterline from Loop Road with wildlife waterings | Rural water service available; piped water to some troughs and 4-stock tanks. | -5% | ±25 surface acre "Jesse McNeel Lake No. 4" and 2 stable stock tanks (supplemented). | -10% | Rural water service available; piped water to some troughs and 7 stock tanks (some supplemented). | -5.0% | ±30 surface acre lake (muddy). | -10% | ±5 surface acre stock tank. | -5% | ±5 surface acre stock tank. | -5% |
| Easements/Encumbrances | 10 natural gas well sites (producing and non-producing); flow line and pipeline easements; tank batteries; daily oilfield activity; etc. | Similar | 0% | Similar | 0% | Similar | 0% | Similar | 0% | Similar | 0% | Similar | 0% |
| Recreational Appeal | Game fencing; very good recreational appeal; strictly managed; exotic game herd; supplemented whitetail genetics; etc. | Partial game fencing; good recreational appeal; etc. | 5.0% | Game fencing good recreational appeal; strictly managed; notable fish habitat; supplemented whitetail genetics; etc. | 0.0% | Game fencing good game and recreational appeal; 26 deer breeding pens; introduced whitetail genetics; etc. | 0.0% | Game fencing good recreational appeal; strictly managed; notable fish habitat; supplemented whitetail genetics; etc. | 0.0% | Game fencing good recreational appeal; strictly managed; supplemented whitetail genetics; etc. | 0% | Game fencing good recreational appeal; strictly managed; supplemented whitetail genetics; etc. | 0% |
| Airstrip Access | Yes | None | 2.5% | None | 2.5% | None | 2.5% | None | 2.5% | None | 2.5% | None | 2.5% |
| Total Adjustments | | | 32.5% | | -2.5% | | 12.5% | | -2.5% | | 2.5% | | 0.0% |
| INDICATED VALUE / ACRE | | | $3,087 | | $3,040 | | $3,032 | | $3,431 | | $3,516 | | $3,282 |

| | |
|---|---|
| Minimum | $3,032 |
| Maximum | $3,516 |
| Average | $3,232 |
| Median | $3,185 |
| Concluded | $3,200 |
| Value | $2,566,400 |
| Value (Rounded) | $2,565,000 |

When comparing sold properties to the La Perla HQ Tract, Mr. Swanson noted that the La Perla HQ Tract had "good water features, ±6.0 surface acre [House] lake, Arroyo Salado frontage (wet

**[\*11]** weather);[15] piped water." Mr. Swanson noted the "±30 surface acre lake (muddy)" on Twin Lakes South but made no adjustment to the sale price per acre considering this minor water feature that he found to be equivalent to those noted with respect to the La Perla HQ Tract. Mr. Swanson noted the "±3 surface acre stock tank" on Twin Lakes North and adjusted the sale price per acre up 5% considering this minor water feature that he found to be inferior to those noted with respect to the La Perla HQ Tract. These adjustments are shown in the following table from Mr. Swanson's relevant report:

---

[15] In his report, Mr. Swanson described Arroyo Salado as "a wet weather creek which bisects the southern portion of" the La Perla HQ Tract.

[*12]

| | Subject Property | 1 Bell Ranch | Adj. | 2 Badger Capital Partners, LP | Adj. | 3 Mt Cancion Ranch | Adj. | 4 Twin Lakes South | Adj. | 5 Twin Lakes North | Adj. | 6 Myers Ranch | Adj. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sale No.** | | 1 | | 2 | | 3 | | 4 | | 5 | | 6 | |
| **Ranch** | Subject Property | Bell Ranch | | Badger Capital Partners, LP | | Mt Cancion Ranch | | Twin Lakes South | | Twin Lakes North | | Myers Ranch | |
| **Sale Price** | | $1,500,000 | | $2,097,000 | | $2,000,000 | | $1,226,800 | | $1,851,150 | | $3,699,000 | |
| **Price/Acre** | | $1,316 | | $2,094 | | $1,818 | | $2,250 | | $2,150 | | $3,329 | |
| **Minerals** | Surface only; N/A | Surface only | $0 | Surface only | $0 | Surface only | $0 | Surface only | $0 | Surface only | $0 | Surface only | $0 |
| **Financing & Condition of Sale** | N/A | Cash to seller, arm's length | $0 | Cash to seller, arm's length | $0 | Cash to seller, arm's length | $0 | Cash to seller, arms length | $0 | Cash to seller, arms length | $0 | For sale | $0 |
| **Water Rights** | 513 acre feet of Class B Water Rights for irrigation purposes & mining purposes, CV ~ $616,000 or $502/acre) | None. | $502 | 91 acre feet of Class B Water rights out of the Rio Grande River, CV $11/ac. | $491 | 111 acre feet of water rights for irrigation purposes, 2.46 acre feet of water rights for mining purposes & 16.4 acre feet of water rights for multi-use purposes, CV $48/ac. | $454 | 1.89 acre feet of water rights for irrigation purposes & 4.24 acre feet of water rights for mining purposes. CV $9/ac. | $493 | 1.89 acre feet of water rights for irrigation purposes & 4.24 acre feet of water rights for mining purposes. CV $9/ac. | $493 | 1.89 acre feet of water rights for irrigation purposes & 4.24 acre feet of water rights for mining purposes. CV $9/ac. | ($500) |
| **Personal Property** | Two pivot irrigation systems - CV $107,000, or $87/acre | N/A | $87 | N/A | $87 | N/A | $87 | N/A | $87 | N/A | $87 | N/A | $87 |
| **Improvements** | Lodge, Barn w/apartments, Palapa, etc. (ECV ~$1,840,000 or $1,499/ac) | Doublewide manufactured home, barn w/ a walk-in cooler, game-cleaning area, etc., guest house, various other sheds and outbuildings, etc. ECV $100,000 or $100/Ac. | $1,499 | Ranch house, bunkhouse, two barns, various other sheds and outbuildings, etc. ECV $300,000 or $273/Ac. | $1,399 | None of value. | $1,226 | None of value. | $1,499 | 5-6 bedroom/3.5 bathroom Ranch House and Casita (ECV ~$450,000, or $405/acre) | $1,094 | None of value. | $1,499 |
| **Date of Sale** | Mar-21 | Dec-20 | $147 | Jul-20 | $268 | Dec-19 | $283 | Dec-19 | $450 | Dec-19 | $422 | Current | $0 |
| **ADJUSTED PRICE/ ACRE** | | | $3,551 | | $4,339 | | $3,916 | | $4,740 | | $4,651 | | $4,503 |
| **Adjustments** | | | | | | | | | | | | | |
| **Size** | 1,227,650 | 1,139,680 | 0.0% | 1,001,300 | 0.0% | 1,100,000 | 0.0% | 500,800 | 10.0% | 861,000 | -5.0% | 1,111,000 | -2.5% |
| **Location & Access** | Zapata County, access off U.S. Highway 83; 14.1 miles NE of San Ygnacio; ±32.0 miles S of Laredo, Zapata. | Zapata County, easement access off State Highway 16; 15.0 miles W of Randado; ±18.0 miles E of San Ygnacio. | 15% | Zapata County, easement access off U.S. Highway 83; 14.2 miles NE of San Ygnacio. | 0.0% | Zapata County, easement access off State Highway 16; 15.0 miles W of Randado; ±25.0 miles NE of Zapata. | 0.0% | Zapata County, easement access off U.S. Highway 83; 14.0 miles NE of San Ygnacio. | 0% | Zapata County, easement access off U.S. Highway 83; 14.0 miles NE of San Ygnacio. | 0% | Zapata County, easement access off U.S. Highway 83; 14.0 miles NE of San Ygnacio. | 0% |
| **Land Features** | Mostly level to gently rolling terrain with some rolling gravel hills; mostly native pasture with a good cover of mid to high canopy trees and underbrush in the deeper soils and low to mid canopy brush in the shallower soil areas; good infrastructure and condition; good all-weather roads, good fencing, etc.; 30% floodplain, 64 acres pivoted fields (2 fields). | Mostly level to gently rolling terrain with some rolling gravel hills; mostly native pasture with a good cover of mid to high canopy trees and underbrush in the deeper soils and low to mid canopy brush in the shallower soil areas; average infrastructure and condition; average interior road system, average fencing, etc.; no floodplain. | 10% | Mostly level to gently rolling terrain with some rolling gravel hills; mostly native pasture with a good cover of mid to high canopy trees and underbrush in the deeper soils and low to mid canopy brush in the shallower soil areas; average to good infrastructure and condition; good interior road system, good fencing, etc.; 10% floodplain. No food plots. | 5% | Mostly level to gently rolling terrain with some rolling gravel hills; mostly native pasture with a good cover of mid to high canopy trees and underbrush in the deeper soils and low to mid canopy brush in the shallower soil areas; some selectively cleared areas (strips, senderos, food plots, etc.); standard infrastructure and condition; no floodplain. | 5% | Mostly level to gently rolling terrain with some rolling gravel hills; mostly native pasture with a good cover of mid to high canopy trees and underbrush in the deeper soils and low to mid canopy brush in the shallower soil areas; average to good infrastructure and condition; good interior road system, good fencing, etc.; no floodplain. No food plots. | 5% | Mostly level to gently rolling terrain with some rolling gravel hills; mostly native pasture with a good cover of mid to high canopy trees and underbrush in the deeper soils and low to mid canopy brush in the shallower soil areas; average to good infrastructure and condition; good interior road system, good fencing, etc.; limited floodplain. No food plots. | 5% | Mostly level to gently rolling terrain with some rolling gravel hills; mostly native pasture with a good cover of mid to high canopy trees and underbrush in the deeper soils and low to mid canopy brush in the shallower soil areas; average to good infrastructure and condition; good interior road system, good fencing, etc.; limited floodplain. One food plot. | 2.5% |
| **Water Features** | Initially considered standard but good water features, ±60 surface acre lake Arroyo Salado frontage (wet weather); piped water | Rural water service available; piped water to some troughs and 4 stock tanks. | 5% | 1.25 surface acre "Jesse McNeel Lake No. 4" and 2 sizable stock tanks (supplemented). | 5% | Rural water service available; piped water to some troughs and 7 stock tanks (some supplemented). | 0% | ±10 surface acre lake (muddy). | 5.0% | ±3 surface acre stock tank. | 0% | ±5 surface acre stock tank. | 5% |
| **Easements/ Encumbrances** | 4 natural gas well sites (producing and non-producing); flow line and pipeline easements; tank batteries; daily oilfield activity, etc. | Similar | 0% | Similar | 0% | Similar | 0% | Similar | 0% | Similar | 0% | Similar | 0% |
| **Recreational Appeal** | Game fencing good recreational appeal; strictly managed; 2 food plots, deer pens, supplemental genetics, exotics, etc. | Partial game fencing good recreational appeal, etc. | 2.5% | Game fencing good recreational appeal; strictly managed; notable fish habitat; supplemented whitetail genetics, etc. | 2.5% | Game fencing good game and recreational appeal; 26 deer breeding pens; introduced whitetail genetics, etc. | 0.0% | Game fencing good recreational appeal; strictly managed; notable fish habitat; supplemented whitetail genetics, etc. | 0% | Game fencing good recreational appeal; strictly managed; supplemented whitetail genetics, etc. | 0% | Game fencing good recreational appeal; strictly managed; supplemented whitetail genetics, etc. | 0% |
| **Airstrip Access** | Yes | None | 2.5% | None | 2.5% | None | 2.5% | None | 2.5% | None | 2.5% | None | 2.5% |
| **Total Adjustments** | | | 35.0% | | 7.5% | | 22.5% | | 22.5% | | 7.5% | | 10.0% |
| **INDICATED VALUE /ACRE** | | | $4,794 | | $4,665 | | $4,797 | | $4,859 | | $5,000 | | $4,954 |

| | |
|---|---|
| Minimum | $4,665 |
| Maximum | $5,000 |
| Average | $4,845 |
| Median | $4,828 |
| Concluded | $4,850 |
| Value | $5,954,103 |
| Value (Rounded) | $5,955,000 |

Odd in comparison were Mr. Swanson's adjustments regarding the Twin Lakes South and Twin Lakes North minor water features in his Lone-Star Tract comparable property sales analysis. Mr. Swanson

**[\*13]** noted that the Lone-Star Tract's minor water features were "Trophy Lake - ±18-acre lake; Arroyo Salado frontage (wet weather)." Mr. Swanson noted the "±30 surface acre lake (muddy)" on Twin Lakes South and adjusted the sale price per acre down 10%. Mr. Swanson noted the "±3 surface acre stock tank" on Twin Lakes North and adjusted the sale price per acre up 10%. What had previously been a 5% gap with respect to the water features on Twin Lakes South and Twin Lakes North, *see* the prior two tables, *supra*, was suddenly 20%, with no explanation provided. The Lone-Star Tract comparable sales analysis is shown in the following table from Mr. Swanson's relevant report:

**[*14]**

| Item | Subject Property | 1 Bell Ranch | Adj. | 2 Badger Capital Partners, LP | Adj. | 3 Mi Concion Ranch | Adj. | 4 Twin Lakes South | Adj. | 5 Twin Lakes North | Adj. | 6 Myers Ranch | Adj. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sale No. | | 1 | | 2 | | 3 | | 4 | | 5 | | 6 | |
| Ranch | Subject Property | Bell Ranch | | Badger Capital Partners, LP | | Mi Concion Ranch | | Twin Lakes South | | Twin Lakes North | | Myers Ranch | |
| Sale Price | | $1,500,000 | | $2,097,000 | | $2,000,000 | | $1,126,500 | | $1,851,150 | | $3,699,000 | |
| Price/Acre | | $1,316 | | $2,094 | | $1,818 | | $2,250 | | $2,150 | | $3,329 | |
| Minerals | Surface only. | Surface only. | $0 | Surface only. | $0 | Surface only. | $0 | Surface only. | $0 | Surface only. | $0 | Surface only. | $0 |
| Financing & Condition of Sale | N/A | Cast to seller; arm's length | $0 | Cash to seller; arm's length. | $0 | Cash to seller; arm's length. | $0 | Cash to seller arms length. | $0 | Cash to seller arms length. | $0 | For sale | ($500) |
| Water Rights | 40 acre feet of Class B Water Rights for irrigation purposes & mining purposes. CV ~ $48,000 or $48/acre) | None. | $48 | 91 acre feet of Class B Water rights out of the Rio Grande River, CV $11/ac. | $37 | None. | $48 | 1.111 acre feet of water rights for irrigation purposes, 2.46 acre feet of water rights for mining purposes & 3.164 acre feet of water rights for multi-use purposes. CV $48/ac. | $0 | 1.89 acre feet of water rights for irrigation purposes & 4.24 acre feet of water rights for mining purposes. CV $9/ac. | $39 | 1.89 acre feet of water rights for irrigation purposes & 4.24 acre feet of water rights for mining purposes. CV $9/ac. | $39 |
| Personal Property | N/A | N/A | $0 | N/A | $0 | N/A | $0 | N/A | $0 | N/A | $0 | N/A | $0 |
| Improvements | None | None of value | $0 | Doublewide manufactured home, barn w/ a walk-in cooler, game cleaning area, etc, guest house, various other sheds and outbuildings, etc. ECV $100,000 or $100/Ac. | ($100) | Ranch house, bunkhouse, two barns, various other sheds and outbuildings, etc. ECV $300,000 or $273/Ac. | ($273) | None of value. | $0 | None of value. | $0 | 5-bedroom/3.5 bathroom Ranch House and Casita (ECV $450,000, or $405/acre) | ($405) |
| **Adjustments** | | | | | | | | | | | | | |
| Date of Sale | Mar-21 | Dec-20 | $147 | Jul-20 | $168 | Dec-19 | $283 | Dec-19 | $450 | Dec-19 | $422 | Current | $0 |
| **ADJUSTED PRICE/ACRE** | | | $1,511 | | $2,299 | | $1,876 | | $2,700 | | $2,611 | | $2,463 |
| Location & Access | Zapata County, easement access off U.S. Highway 83; 14.1 miles NE of San Ygnacio; ±32.0 miles S of Laredo. | Zapata County, easement access off State Highway 16; 15.0 miles W of Randado; ±18.0 miles E of Zapata. | 15% | Zapata County, easement access off U.S. Highway 83; 14.2 miles NE of San Ygnacio. | 0.0% | Zapata County, easement access off State Highway 16; 15.0 miles W of Randado; ±25.0 miles NE of Zapata. | 0.0% | Zapata County, easement access off U.S. Highway 83; 14.0 miles NE of San Ygnacio. | 0.0% | Zapata County, easement access off U.S. Highway 83; 14.0 miles NE of San Ygnacio. | 0.0% | Zapata County, easement access off U.S. Highway 83; 14.0 miles NE of San Ygnacio. | 0.0% |
| Size | 1,000.000 | 1,139.680 | 0.0% | 1,001.300 | 0.0% | 1,100.000 | 0.0% | 500.800 | -5.0% | 861.000 | -5.0% | 1,111.000 | 0.0% |
| Land Features | Mostly level to gently rolling terrain with some rolling gravel hills; mostly native pasture with a good cover of mid to high canopy trees and underbrush in the deeper soils and low to mid canopy brush in the shallower soil areas; good infrastructure and condition; good all-weather roads, good fencing, etc. 10% floodplain, system, average fencing, etc. no food plot. | Mostly level to gently rolling terrain with some rolling gravel hills; mostly native pasture with a good cover of mid to high canopy trees and underbrush in the deeper soils and low to mid canopy brush in the shallower soil areas, average infrastructure and condition; average interior road system, average fencing, etc. no floodplain. | 15% | Mostly level to gently rolling terrain with some rolling gravel hills; mostly native pasture with a good cover of mid to high canopy trees and underbrush in the deeper soils and low to mid canopy brush in the shallower soil areas, average to good infrastructure and condition, good interior road system, good fencing, etc. 10% floodplain. No food plots. | 2.5% | Mostly level to gently rolling terrain with some rolling gravel hills; mostly native pasture with a good cover of mid to high canopy trees and underbrush in the deeper soils and low to mid canopy brush in the shallower soil areas; some selectively cleared areas (strips, senderos, food plots, etc.); standard infrastructure and condition; no floodplain. | 5% | Mostly level to gently rolling terrain with some rolling gravel hills; mostly native pasture with a good cover of mid to high canopy trees and underbrush in the deeper soils and low to mid canopy brush in the shallower soil areas; average to good infrastructure and condition; good interior road system, good fencing, etc; no floodplain. No food plots. | 2.5% | Mostly level to gently rolling terrain with some rolling gravel hills; mostly native pasture with a good cover of mid to high canopy trees and underbrush in the deeper soils and low to mid canopy brush in the shallower soil areas; average to good infrastructure and condition; average to good infrastructure and condition good interior road system, good fencing, etc; limited floodplain. No food plots. | 2.5% | Mostly level to gently rolling terrain with some rolling gravel hills; mostly native pasture with a good cover of mid to high canopy trees and underbrush in the deeper soils and low to mid canopy brush in the shallower soil areas; average to good infrastructure and condition; average to good infrastructure and condition good interior road system, good fencing, etc; limited floodplain. One food plot. | 2.5% |
| Recreational Appeal | Game fencing very good recreational appeal; strictly managed; exotic game herd; supplemented whitetail genetics, managed fishery, etc. | Partial game fencing good recreational appeal, etc. | 10.0% | Game fencing good recreational appeal; strictly managed; notable fish habitat; supplemented whitetail genetics, etc. | 5.0% | Game fencing good game and recreational appeal, 26 deer breeding pens; introduced whitetail genetics, etc. | 2.5% | Game fencing good recreational appeal; strictly managed; notable fish habitat supplemented whitetail genetics, etc. | 5.0% | Game fencing good recreational appeal; strictly managed; supplemented whitetail genetics, etc. | 5.0% | Game fencing good recreational appeal; strictly managed; supplemented whitetail genetics, etc. | 5% |
| Easements/Encumbrances | 26 natural gas well sites (producing and non-producing); numerous flow line and pipeline easements; tank batteries, daily oilfield activity, etc. | Similar | 0% | Similar | 0% | Similar | 0% | Similar | 0% | Similar | 0% | Similar | 0% |
| Water Features | Trophy Lake - ±18-acre lake, Arroyo Salado frontage (wet weather) | Rural water service available; piped water to some troughs and 4 stock tanks. | 10% | ±25 surface acre "Jesse McNeel Lake No. 4" and 2 sizable stock tanks (supplemented). | 0% | Rural water service available; piped water to some troughs and 7 stock tanks (some supplemented). | 0% | ±30 surface acre lake (muddy); ±3 surface acre stock tank | -10% | ±3 surface acre stock tank. | 10% | ±5 surface acre stock tank. | 10% |
| Airstrip Access | Yes | None | 2.5% | None | 2.5% | None | 2.5% | None | 2.5% | None | 2.5% | None | 2.5% |
| Total Adjustments | | | 52.5% | | 10.0% | | 30.0% | | -5.0% | | 20.0% | | 20.0% |
| INDICATED VALUE /ACRE | | | $2,305 | | $2,529 | | $2,439 | | $2,565 | | $3,134 | | $2,956 |

| | |
|---|---|
| Minimum | $2,305 |
| Maximum | $3,134 |
| Average | $2,655 |
| Median | $2,547 |
| Concluded Value /ACRE | $2,650 |
| Value | $2,650,000 |
| Value (Rounded) | $2,650,000 |

In short, Mr. Swanson's analyses show that he found the 30-acre lake on Twin Lakes South increased the land value by only 5–20% more than a 3-acre stock tank increased the land value of Twin Lakes North.

**[*15]**  Other facts also support a low value for the lake on Twin Lakes South. Twin Lakes South sold for $2,250 per acre and Twin Lakes North sold for $2,150 per acre. But Twin Lakes South is only 58% the size of Twin Lakes North, and it is well established that smaller parcels (other things being equal) generally sell for higher per-acre prices than larger parcels. *See Estate of Giovacchini v. Commissioner*, T.C. Memo. 2013-27, at *96–97; *Estate of Kolczynski v. Commissioner*, T.C. Memo. 2005-217, 2005 Tax Ct. Memo LEXIS 219, at *17 (noting premium paid for smaller parcels). In addition to being smaller, Twin Lakes South also had water rights worth $48 per acre, while the water rights for Twin Lakes North were worth only $9 per acre. Mr. Swanson noted no other significant differences between the properties other than the lake on Twin Lakes South compared to the stock tank on Twin Lakes North.[16] Reducing the sale price for Twin Lakes South by $39 per acre for the additional water rights and by a small amount per acre considering its smaller parcel size (relative to Twin Lakes North) results in a per-acre sale price almost identical to that of Twin Lakes North. This is strong evidence that the 30-acre lake on Twin Lakes South has little or no value above the 3-acre stock tank on Twin Lakes North. And nothing in Mr. Swanson's reports indicates that a 3-acre stock tank has more than a minimal effect on a property valuation.

Considering the facts summarized above, we find that the lake on Twin Lakes South added 5–20% to the value of the Twin Lakes South land. The low value of a lake that covers 6% of Twin Lakes South strongly indicates that Mr. Swanson significantly overvalued the major water features on the La Perla HQ Tract and Jalisco Ranch (which cover 8.7% and 10.7% of the properties, respectively).

In his reports, Mr. Swanson gave equal weight to each of the nine case studies in determining that, on average, a major water feature increases the value of land by 96%. We make three adjustments to Mr. Swanson's conclusion. First, we give no weight to case study 2, which involved a major feature property with only "rural water service available and eighteen stock tanks" of unstated size. Second, we give double weight to case studies 1, 7, and 8, which involve major water feature properties that all appear to be about 10% covered by water

---

[16] In one of the three tables from Mr. Swanson's reports, *see supra* p. 12, he adjusted the price per acre for Twin Lakes South up by 5% regarding "[l]and [f]eatures" but adjusted the price per acre for Twin Lakes North up by only 2.5% regarding land features. In the other two tables there was no difference in the land feature adjustments for the properties. We find the 2.5% difference in one of the tables to be insignificant.

**[\*16]** (close to the water coverage percentages for the La Perla HQ Tract and Jalisco Ranch). These two adjustments somewhat offset each other; making both reduces the average premium only from 96% to 94%.

Third, we find that a 5–20% valuation premium for the 30-acre lake on Twin Lakes South strongly indicates that a 94% valuation premium for the major water features on the La Perla HQ Tract and Jalisco Ranch is significantly too high. Although the Twin Lakes South property is not a perfect comparable property to the La Perla HQ Tract and Jalisco Ranch, it is much more closely comparable than any case study major water feature property. We find that a one-third reduction to the 94% average premium discussed in the prior paragraph is appropriate considering facts regarding Twin Lakes South. We therefore find that a 63% valuation premium is appropriate for the major water features on both the La Perla HQ Tract and Jalisco Ranch.

### B. *Overvaluing Underlying Land*

In *Discussion* Part II.A, *supra*, we included tables from Mr. Swanson's reports that show how he determined the value of the underlying land for both the La Perla HQ Tract and Jalisco Ranch. The table pertaining to the La Perla HQ Tract showed a rounded value for the La Perla HQ Tract land of $5,955,000. Elsewhere in his report, Mr. Swanson subtracted from that amount certain other items reflected in the table: (1) water rights worth $616,000; (2) irrigation systems worth $107,000; and (3) improvements (other than lakes) worth $1,840,000. Accordingly, Mr. Swanson determined that the "value of the underlying land is approximately $2,760 per acre or $3,392,000."

Mr. Swanson failed to similarly subtract improvements for Jalisco Ranch. The table pertaining to Jalisco Ranch showed a rounded value for the Jalisco Ranch land of $2,565,000. Mr. Swanson subtracted from that amount: (1) water rights worth $240,000 and (2) irrigation systems worth $126,000. However, Mr. Swanson failed to subtract "Jalisco Lake [i]nfrastructure" improvements worth $330,000. This is despite his note that those improvements were to be "[c]onsidered with lake and separately from land."[17] Mr. Swanson determined that the "value of the underlying [Jalisco Ranch] land is $2,199,000 or $2,740 per acre." Also subtracting the $330,000 in lake infrastructure

---

[17] In another part of his report, Mr. Swanson similarly stated that "the Jalisco Lake Complex include[s] . . . all infrastructure related to the lake" and found this lake complex to double the value of the underlying Jalisco Ranch land.

[*17] improvements results in a value for the underlying land of only $1,869,000 ($2,330 per acre).

Mr. Swanson committed another error with respect to each comparable property sale used to value the land of both the La Perla HQ Tract and Jalisco Ranch. As shown in the relevant tables, he made dollar per acre adjustments to comparable sales with respect to the water rights, irrigation systems, and improvements for the La Perla HQ Tract and Jalisco Ranch, as well as adjustments based on sale dates and (for one property) an adjustment because the comparable was only a listing rather than an actual sale. In doing so he reached an "adjusted price/acre" for each comparable property sale. Mr. Swanson then made additional percentage adjustments to comparable property sales regarding attributes such as location, land features, minor water features, airstrip access, etc. He multiplied these percentage adjustments (plus one) by the adjusted price per acre that he had previously reached. Finally, he subtracted out specific values for the water rights, irrigation systems, and (for the La Perla HQ Tract only) other improvements. The issue is that most of Mr. Swanson's percentage adjustments to comparable property sales were positive. Thus, Mr. Swanson added the water rights, irrigation system, and improvement values, allowed them to be multiplied by mostly positive percentages (plus one), and then subtracted out the original values. This was advantageous for petitioners, but erroneous as a matter of valuation.

As an example, comparable sale #1 for the La Perla HQ Tract was a property named Bell Ranch, which sold for $1,316 per acre. Mr. Swanson added water rights, irrigation system, and improvement values totaling $2,088 per acre, as well as a date of sale adjustment of $147 per acre, to reach an adjusted price per acre of $3,551. Mr. Swanson then multiplied that $3,551 by 1.35 owing to other adjustments he made to the Bell Ranch sale totaling 35%. This resulted in an "indicated value/acre" of $4,794. Mr. Swanson then effectively subtracted $2,088 from $4,794, which equals $2,706.[18] Had Mr. Swanson simply never

---

[18] Mr. Swanson used the $4,794 "indicated value/acre," as well as "indicated value/acre" from the five other comparable sales, to determine that the value of the La Perla Tract land was $4,850 per acre, or $5,955,000 total. Mr. Swanson then subtracted out the water rights, irrigation system, and improvement values totaling $2,563,000 ($2,088 per acre), resulting in a value for the La Perla Tract land of $3,392,000 ($2,760 per acre). The outcome would have been the same (assuming use of the same rounding methods) had Mr. Swanson subtracted $2,088 from the "indicated value/acre" for each comparable property sale and then used the six resulting amounts to determine the per-acre value for the La Perla Tract land.

**[*18]** added the water rights, irrigation system, and improvement values to begin with, his "indicated value/acre" for Bell Ranch would have been only $1,975 (($1,316 + $147) × 1.35). The difference between $1,975 and $2,706 is $731, which is (of course) 35% of $2,088. In short, Mr. Swanson's method improperly added $731 to the "indicated value/acre" for Bell Ranch, which increased the value that Mr. Swanson assigned to the La Perla HQ Tract land.

Correcting this error with respect to each comparable property sale for both the La Perla HQ Tract and Jalisco Ranch results in an average price per acre reduction of $296 for the La Perla HQ Tract (about $363,000 total) and $62 for Jalisco Ranch[19] (about $50,000 total).[20]

C. *Valuation Conclusions*

For the La Perla HQ Tract, correcting the errors described *supra Discussion* Part II.B yields a value for the underlying land of $3,027,385. Applying a 63% valuation premium for the large lakes and forage ponds increases the value to $4,934,638. To that amount we add $107,000 for irrigation systems, $1,840,000 for improvements, and $616,000 for water rights associated with the property, increasing the value to $7,497,638. Making minor rounding adjustments, we find that, as of October 31, 2022, the value of the La Perla HQ Tract was $7.5 million.

For Jalisco Ranch, correcting the errors described *supra Discussion* Part II.B yields a value for the underlying land of $1,820,676. Applying a 63% valuation premium for the large lake and forage ponds increases the value to $2,967,702. To that amount, we add $126,000 for

---

[19] The Jalisco Ranch adjustment is significantly smaller because (1) the water rights, irrigation system, and improvement values for Jalisco Ranch were smaller than those for the La Perla HQ Tract and (2) Mr. Swanson's percentage adjustments to comparable property sales were smaller with respect to Jalisco Ranch than they were with respect to the La Perla HQ Tract. We note that a much smaller adjustment (around $11,000, or $11 per acre) could apply to the Lone-Star Tract, but we will consider the error with respect to the Lone-Star Tract comparable property sales to be de minimis.

[20] In each of his tables, Mr. Swanson calculated maximum, minimum, average, and median prices per acre of comparable properties and determined a "[c]oncluded" price per acre using an unclear method. Correcting Mr. Swanson's errors reduces the maximum, minimum, and median prices per acre by amounts different from the average price per acre reduction. Because the method by which Mr. Swanson determined the concluded price per acre is not clear, we find use of the reduction in average price per acre to be the most appropriate.

**[*19]** irrigation systems and $240,000 for water rights associated with the property, increasing the value to $3,333,702.[21] Making minor rounding adjustments, we find that, as of October 31, 2022, the value of Jalisco Ranch was $3,335,000.

III.    *Background of Section 183 and Treasury Regulation §§ 1.183-1 and 1.183-2*

Interpreting the Code and earlier statutes, courts have long recognized that taxpayers generally may not deduct losses sustained in activities not engaged in for profit. *See Temple v. Commissioner*, 10 B.T.A. 1238, 1241 (1928) (holding that taxpayer "was engaged in the business of ranching and farming for profit and he is entitled to [a] deduction . . . under section 214 of the Revenue Act of 1921"); *Farish v. Commissioner*, 103 F.2d 63, 65 (5th Cir. 1939) (holding that "[a]s to both partnerships we conclude that they were transactions entered into for profit and the losses incurred . . . were deductible" under section 23 of the Revenue Act of 1932), *rev'g* 36 B.T.A. 1114 (1937); *Bessenyey v. Commissioner*, 45 T.C. 261, 273 (1965) (stating that "[u]nder any of the possibly pertinent provisions of the 1954 Code, it is necessary that the operation be conducted for the purpose of making a profit" and citing sections 162, 165, and 212 in a footnote), *aff'd*, 379 F.2d 252 (2d Cir. 1967). As the U.S. Court of Appeals for the Ninth Circuit has explained:

> From the early case of Wilson v. Eisner, 282 F. 38 (2d Cir., 1922) through Brooks v. C. I. R., 274 F.2d 96 (9th Cir., 1959) and Wright v. Hartsell, 305 F.2d 221 (9th Cir., 1962), the warp and woof of the definitions of "carrying on any trade or business" as used in Section 23 and elsewhere in the [Internal Revenue Code of 1939], is that the activity or enterprise claimed to constitute "carrying on a business" be entered into, in good faith, with the dominant hope and intent of realizing a profit, i.e., taxable income, therefrom. As Judge Learned Hand pointed out in Thacher v. Lowe, 288 F. 994 (D.C.N.Y. 1922), in ascertaining that intention, the Court must consider if it can be honestly said to be carried on for profit. "[I]f a man does not expect to make

---

[21] We do not add the $330,000 in lake infrastructure improvements because, as Mr. Swanson noted, these improvements were to be "[c]onsidered with lake and separately from land." These improvements are accounted for as part of the 63% major water feature valuation premium.

**[\*20]** any gain or profit out of the [activity], it cannot be said to be a business for profit." (At 995).

From the very import of Section 23, which presupposes that the taxpayer has received taxable income before deductions can be taken therefrom, it is clear that Congress intended that the profit or income motive must first be present in and dominate any taxpayer's "trade or business" before deductions may be taken. While the expectation of the taxpayer need not be reasonable, and immediate profit from the business is not necessary, nevertheless, the basic and dominant intent behind the taxpayer's activities, out of which the claimed expenses or debts were incurred, must be ultimately to make a profit or income from those very same activities. Doggett v. Burnet, 62 App.D.C. 103, 65 F.2d 191 (1933); C. I. R. v. Widener, 33 F.2d 833 (3d Cir., 1929); Coffey v. C. I. R., 141 F.2d 204 (5th Cir., 1944); Morton v. C. I. R., 174 F.2d 302 (2d Cir., 1949); Brooks v. C. I. R., supra; Trent v. C. I. R., 291 F.2d 669 (2d Cir., 1961). Absent that basic and dominant motive, the taxpayer's activities, no matter how intensive, extensive or expensive, have not been construed by the Courts as carrying on a trade or business within the purview of Section 23. Coffey v. C. I. R., supra; Morton v. C. I. R., supra; Thacher v. Lowe, supra; White v. C. I. R., 227 F.2d 779 (6th Cir., 1955); Kerns Wright, 31 T.C. 1264, aff. 274 F.2d 883 (6th Cir., 1960); Stephen H. Tallman, 37 B.T.A. 1060.

*Hirsch v. Commissioner*, 315 F.2d 731, 736–37 (9th Cir. 1963), *aff'g* T.C. Memo. 1961-256.

Against this backdrop, section 183 was enacted in 1969 and effective for taxable years beginning after December 31, 1969. Tax Reform Act of 1969, Pub. L. No. 91-172, § 213, 83 Stat. 487, 571–72. The present text of section 183(a) through (c) provides:

Sec. 183. Activities not engaged in for profit
    (a) General rule.—In the case of an activity engaged in by an individual or an S corporation, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section.

**[*21]** (b) Deductions allowable.—In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed—

(1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and

(2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).

(c) Activity not engaged in for profit defined.—For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.

Excepting one minor change,[22] section 183(a) through (c) has not been amended since enactment.

Analyzing section 183 and regulations pertaining to that section, we have stated:

The somewhat enigmatic language of section 183 can be better understood by viewing that section in the context of its position in the Code. Section 183 is found in subtitle A, chapter A, subchapter B, part VI, entitled "Itemized Deductions for Individuals and Corporations." The first section under part VI is section 161, which provides, in part, "in computing taxable income under section 63(a), there shall be allowed as deductions the items specified in this part."

Such specified deductible items include, among numerous others, trade or business expenses (sec. 162),

---

[22] In 1982 "an electing small business corporation (as defined in section 1371(b))" was struck from section 183(a) and "an S corporation" was inserted in its place. Subchapter S Revision Act of 1982, Pub. L. No. 97-354, § 5(a)(23), 96 Stat. 1669, 1694.

[*22] interest (sec. 163), and taxes (sec. 164). Viewed in the context of its position in part VI, section 183 is simply a statute that allows certain deductions attributable to "activities not engaged in for profit" in computing taxable income under section 63(a). Section 183(c) defines an "activity not engaged in for profit" as an activity for which deductions under section 162 or section 212(1) or (2) would not be allowable.

. . . .

The legislative history surrounding section 183 indicates that one of the prime motivating factors behind its passage was Congress' desire to create an objective standard to determine whether a taxpayer was carrying on a business for the purpose of realizing a profit or was instead merely attempting to create and utilize losses to offset other income. S. Rept. No. 91-552, to accompany H.R. 13270 (Pub. L. 91-172), 91st Cong., 1st Sess. 104 (1969).

In an effort to comply with the congressional purpose of establishing objective tests to determine subjective intentions, the Commissioner promulgated regulations under section 183 which set forth nine separate factors which should be examined in making a profit-motive determination. Sec. 1.183-2(b)(1)–(9), Income Tax Regs. The regulations further provide, however, that these enumerated factors are neither exclusive nor necessarily controlling in each case and that "all the facts and circumstances with respect to the activity are to be taken into account." Sec. 1.183-2(b), Income Tax Regs.

Further, we note that the test under section 183 is not whether the taxpayer's intention and expectation of profit is reasonable but rather whether such intention and expectation is bona fide.

Although section 183 has clearly placed a gloss on post-1969 judicial profit-motive inquiries, we think pre-1969 case law in this area remains relevant. We say this for two reasons. First, section 183(c) defines an "activity not engaged in for profit" as an activity with respect to which deductions would not be allowable under section 162

**[*23]** or section 212(1) or (2). Thus, prior cases dealing with profit motive under these sections retain their vitality. Second, the so-called "relevant factors" set forth in the regulations are themselves derived from prior case law and, therefore, we think such prior law has a role to play in their application.

Accordingly, determinations as to the existence or absence of a profit motive, whether directed toward years beginning prior or subsequent to December 31, 1969, will quite often be identical.

*Jasionowski v. Commissioner*, 66 T.C. 312, 320–22 (1976) (footnotes and most citations omitted).

The legislative history cited in *Jasionowski* states, in part:

The committee amendments provide that an activity is not engaged in for profit if deductions with respect to the activity are not allowable as trade or business expenses or as expenses incurred for the production of income or in connection with property held for the production of income. In making the determination of whether an activity is not engaged in for profit, the committee intends that an objective rather than a subjective approach is to be employed. Thus, although a reasonable expectation of profit is not to be required, the facts and circumstances (without regard to the taxpayer's subjective intent) would have to indicate that the taxpayer entered the activity, or continued the activity, with the objective of making a profit.

S. Rep. No. 91-552, at 104 (1969), *reprinted in* 1969-3 C.B. 423, 490. Although Congress apparently intended for "an objective rather than a subjective approach" to govern "the determination of whether an activity is not engaged in for profit" for purposes of section 183, S. Rep. No. 91-552, at 104, 1969-3 C.B. at 490, Congress did not state as much in section 183. However, as discussed in *Jasionowski*, 66 T.C. at 321, the Secretary issued Treasury Regulation § 1.183-2, which provides that "[t]he determination whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts

**[\*24]** and circumstances of each case." Treas. Reg. § 1.183-2(a).[23] Treasury Regulation § 1.183-2(b) lists nine "factors which should normally be taken into account" in determining whether an activity is engaged in for profit.[24] Treasury Regulation § 1.183-2(b) also provides that

> [i]n determining whether an activity is engaged in for profit, all facts and circumstances with respect to the activity are to be taken into account. No one factor is determinative in making this determination. In addition, it is not intended that only the factors described in this paragraph are to be taken into account in making the determination, or that a determination is to be made on the basis that the number of factors (whether or not listed in this paragraph) indicating a lack of profit objective exceeds the number of factors indicating a profit objective, or vice versa.

The Secretary also issued Treasury Regulation § 1.183-1(d)(1), which provides:

> (1) Ascertainment of activity. In order to determine whether, and to what extent, section 183 and the regulations thereunder apply, the activity or activities of the taxpayer must be ascertained. For instance, where the taxpayer is engaged in several undertakings, each of these may be a separate activity, or several undertakings may constitute one activity. In ascertaining the activity or

---

[23] The Secretary issued Proposed Treasury Regulation §§ 1.183-1 and 1.183-2 in 36 Fed. Reg. 16,112, 16,113–18 (Aug. 19, 1971). The Secretary issued final regulations in 37 Fed. Reg. 13,680–85 (July 13, 1972). Certain differences between the proposed regulations and final regulations will be noted in this Supplemental Memorandum Opinion.

[24] The nine factors are: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or the taxpayer's advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Treas. Reg. § 1.183-2(b). Proposed Treasury Regulation § 1.183-2(b) contained 11 factors, though 2 ("[t]he cause of the losses" and "[e]xpectation of profit by the taxpayer") were removed from the final regulation. *Compare* 36 Fed. Reg. at 16,117, *with* 37 Fed. Reg. at 13,684.

**[\*25]** activities of the taxpayer, all the facts and circumstances of the case must be taken into account. Generally, the most significant facts and circumstances in making this determination are the degree of organizational and economic interrelationship of various undertakings, the business purpose which is (or might be) served by carrying on the various undertakings separately or together in a trade or business or in an investment setting, and the similarity of various undertakings. Generally, the Commissioner will accept the characterization by the taxpayer of several undertakings either as a single activity or as separate activities. The taxpayer's characterization will not be accepted, however, when it appears that his characterization is artificial and cannot be reasonably supported under the facts and circumstances of the case. If the taxpayer engages in two or more separate activities, deductions and income from each separate activity are not aggregated either in determining whether a particular activity is engaged in for profit or in applying section 183. Where land is purchased or held primarily with the intent to profit from increase in its value, and the taxpayer also engages in farming on such land, the farming and the holding of the land will ordinarily be considered a single activity only if the farming activity reduces the net cost of carrying the land for its appreciation in value. Thus, the farming and holding of the land will be considered a single activity only if the income derived from farming exceeds the deductions attributable to the farming activity which are not directly attributable to the holding of the land (that is, deductions other than those directly attributable to the holding of the land such as interest on a mortgage secured by the land, annual property taxes attributable to the land and improvements, and depreciation of improvements to the land).[25]

---

[25] In the sentences regarding farming and the holding of land, Proposed Treasury Regulation § 1.183-1(d)(1) made references to the taxpayer's "expect[ation] that the farming activity will reduce the net cost of carrying the land" and "inten[tion] that the income derived from farming will exceed the deductions attributable to the farming activity which are not directly attributable to the holding of the land." 36 Fed. Reg. at 16,116. These sentences were altered in the final regulation. *Compare* 36 Fed. Reg. at 16,116, *with* 37 Fed. Reg. 13,683.

**[\*26]** IV.    *Summary of the Parties' Arguments and Basis for Decision*

Respondent's position is that we should reaffirm the holding of *Schwarz I*, for two reasons. First, respondent argued that Treasury Regulation §§ 1.183-1 and 1.183-2 are valid because they (A) represent the best interpretation of section 183, *see Loper Bright*, 144 S. Ct. at 2266 (holding that if an agency's interpretation "is not the best, it is not permissible"), and/or (B) are a valid exercise of the rulemaking authority that Congress delegated to the Secretary in section 7805(a).[26] Second, respondent argued that even if both regulations are invalid, our holding should remain the same on the basis of the relevant facts, statutes, and caselaw.

Petitioners' position is more intricate. Petitioners argued that Treasury Regulation §§ 1.183-1 and 1.183-2 are invalid because (1) the regulations violate the notice-and-comment requirements of the Administrative Procedure Act, *see* 5 U.S.C. § 553; (2) the regulations do not represent the best interpretation of section 183; and/or (3) section 7805(a) does not delegate independent discretionary authority to the Secretary to fill gaps in the Code.[27]

As part of their arguments regarding the invalidity of the regulations, petitioners recognized that Congress "codifie[d] a focus on a profit motive from case law interpreting §§ 162 and 212" when it enacted section 183. However, citing S. Rep. No. 91-552, at 104, 1969-3 C.B. at 490, petitioners claimed that "Congress tweaked the profit-motive standard from case law," to be based only on objective factors, to the exclusion of subjective factors. Petitioners proceeded to set out their own "proper test" for determining whether a profit motive exists. Petitioners' test pertains only to allegedly "objective" factors,[28] while excluding

---

[26] In relevant part, section 7805(a) provides that "the Secretary shall prescribe all needful rules and regulations for the enforcement of this title, including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue."

[27] The parties agree that section 183 provides no delegation of authority that would allow the Secretary to issue Treasury Regulation §§ 1.183-1(d)(1) and/or 1.183-2(b).

[28] While petitioners did not explicitly set forth a list of factors, their "proper test" focuses on (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or the taxpayer's advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; and (5) limited financial considerations. Petitioners discount TI's "continuous losses" from its farming activity and describe petitioners' financial status and Dr. Schwarz's enjoyment of TI's farming activity as "irrelevant."

**[\*27]** allegedly subjective factors found in Treasury Regulation § 1.183-2(b). Petitioners argued that "[u]nder the[ir] proper test, [they] would have prevailed."

Petitioners relatedly argued that we should alter our analysis regarding the activity at issue if Treasury Regulation § 1.183-1(d)(1) is found to be invalid. Petitioners claimed that, pursuant to their proposed method of analysis, TI's farming activity and petitioners'/Affiliated Entities' real estate activities were a single activity.

After consideration of the parties' Responses, we will sustain the holding of *Schwarz I* because, even if Treasury Regulation §§ 1.183-1(d)(1) and 1.183-2(b) were held to be invalid, our holding would remain the same. Accordingly, we will not address the validity of those regulations in this Supplemental Memorandum Opinion.

V.     *Partnerships and Section 183*

In *Schwarz I*, T.C. Memo. 2024-55, at \*83 n.100, we stated:

> Absent stipulation to the contrary, this case is appealable to the U.S. Court of Appeals for the Fifth Circuit. *See* § 7482(b)(1)(A). The Tax Court will follow a court of appeals decision which is squarely on point where appeal from our decision lies to that court of appeals alone. *Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971).

> In a case involving interest under section 6621(c), the Fifth Circuit stated that, for partnerships, [the] deductions [at issue in that case were] "*not* actually disallowed *under* I.R.C. § 183, but under I.R.C. §§ 162 and 174." *Copeland v. Commissioner*, 290 F.3d 326, 336 (5th Cir. 2002), *aff'g in part, rev'g and remanding in part* T.C. Memo. 2000-181. The court noted that it is "accepted that in the partnership context, the profit motive inquiry focuses on the partnership, not the individual partners, and that the factors in the Treasury Regulations to I.R.C. § 183 (for determining whether an 'activity is . . . engaged in for profit') may be employed to determine the profit motive required by section[] 162 . . . exists." *Id.* at 335 (footnote omitted). Neither party has argued that *Copeland* affects the section 183 analysis in this case, and we find that it does not.

**[\*28]** In *Copeland v. Commissioner*, 290 F.3d at 334, the Fifth Circuit also stated that

> [t]he plain language of [section 183] thus explicitly cabins its applicability to activities engaged in by *individuals* or *S corporations*—and, by virtue of the traditional maxim of statutory construction, *expressio unis* [sic] *est exclusio alterius* (the expression of one thing is the exclusion of others), precludes the section's applicability to partnerships.

In their responses, neither party addressed *Copeland*. Considering our analysis set forth in this Supplemental Memorandum Opinion, we find that *Copeland* does not affect the result reached herein. However, we note petitioners' implicit argument that there are differences between the profit motive standard applicable to section 183 and the profit motive standard applicable to section 162. Petitioners claimed that when Congress enacted section 183,

> it codifie[d] a focus on a profit motive from case law interpreting §§ 162 and 212. . . .

> However, Congress tweaked the profit-motive standard from case law. Courts previously placed great weight on evidence of a taxpayer's subjective motives, such as whether the taxpayer personally enjoyed the activity. But Congress expressly considered and rejected this approach. Explaining this rejection, the Senate Committee on Finance wrote that "[i]n making the determination of whether an activity is not engaged in for profit, the committee intends that an objective rather than a subjective approach is to be employed." S. Rep. No. 91-552, [at 104, 1969-3 C.B. at 490]. Congress intended the "facts and circumstances" inquiry into whether a taxpayer "engaged in" an activity (*i.e.*, conducted his operations) for profit to be made "without regard to the taxpayer's subjective intent." *Id*. . . . .

We disagree with petitioners' claim that Congress "tweaked" the section 162 profit motive standard for purposes of section 183. Section 183(c) provides that "[f]or purposes of this section, the term 'activity not engaged in for profit' means any activity other than one with respect to which deductions are allowable for the taxable year under section 162

**[\*29]** or under paragraph (1) or (2) of section 212."[29] A plain reading of section 183(c) shows that Congress adopted the profit motive standard applicable to section 162 and did not alter it. To the extent one agrees with petitioners' claim though, we question whether the analysis in *Copeland* would preclude use of a "tweaked" section 183 profit motive standard in this case involving the activity of a partnership. *See Copeland v. Commissioner*, 290 F.3d at 334–35 (holding that (1) the profit motive requirement exists pursuant to section 162 in cases involving partnerships and (2) section 183 does not apply to partnerships, even though "the factors in the Treasury Regulations to I.R.C. § 183 . . . may be employed to determine the profit motive required by section[] 162 . . . exists"). This question may be relevant should this case be appealed.

VI.    *Ascertaining the Activity at Issue*

In *Schwarz I* we ruled that petitioners'/Affiliated Entities' real estate activities and TI's farming activity were separate activities. We began our analysis by discussing the "case as a whole." *Schwarz I*, T.C. Memo. 2024-55, at \*84–86. Among other things, we discussed that (1) "[p]etitioners chose to structure entities they partially or wholly owned in such a way that TI's farming activity was separate from the real estate activities"; (2) "TI's farming activity was focused on ecotourism rather than developing real estate"; (3) "[e]cotourism and real estate activities had distinct objectives"; (4) "[a]ppreciation of La Perla and Jalisco Ranches resulting from TI's ecotourism was incidental to the goal of selling hunting, fishing, and event packages"; (5) TI was paid to do work on properties owned by Affiliated Entities as if it were "a third-party contractor [rather than] part of an integrated business operation"; and (6) petitioners' attempt "to use a strong real estate market and their price-enhancing sales techniques (such as purchasing large tracts and selling smaller pieces) to justify TI's extremely unprofitable ecotourism." *Id.* (footnotes omitted). We concluded that the ties between the real estate activities and TI's farming activity were "weak." *Id.* at \*86.

After discussing the case as a whole, we considered the test regarding farming and the holding of land found in Treasury Regulation

---

[29] Section 212 expressly applies only "[i]n the case of an individual."

[*30] § 1.183-1(d)(1) (the farming and land test).[30] *Schwarz I*, T.C. Memo. 2024-55, at *86–93. Applying the farming and land test, we "ruled that TI's farming activity and LSLP's holding of 1,736 acres [constituting the larger part of La Perla Ranch] are separate activities." *Id.* at *94.

We then analyzed certain other factors set forth in Treasury Regulation § 1.183-1(d)(1) and caselaw (discussed *infra*) and concluded that on the basis of "all the facts and law . . . TI's farming activity and the real estate activities" were separate activities. *Schwarz I*, T.C. Memo. 2024-55, at *94–100.

In their Response filed June 27, 2025, petitioners argued that, if Treasury Regulation § 1.183-1(d)(1) is invalid, our analysis should be altered.[31] Petitioners claimed that Congress intended that "farming and landholding are presumed [to be] one activity unless not interrelated." Petitioners claimed that, in enacting section 183, "Congress expected an individual's activities to be defined '[a]s under present law.' H.R. Rep. No. 91-413, [pt. 1, at 71 (1969), *reprinted in* 1969-3 C.B. 200, 245];[32] *see also* S. Rep. No. 91-552, [at 103, 1969-3 C.B. at 489] (expressing 'basic agreement with the approach taken by the House')." Petitioners then claimed that prior to enactment of section 183, "[i]n the farming context, it was well-understood that farming and holding the farmland are almost always sufficiently interrelated to constitute one business unit."

---

[30] As set forth in Treasury Regulation § 1.183-1(d)(1), the farming and land test provides:

> Where land is purchased or held primarily with the intent to profit from increase in its value, and the taxpayer also engages in farming on such land, the farming and the holding of the land will ordinarily be considered a single activity only if the farming activity reduces the net cost of carrying the land for its appreciation in value. Thus, the farming and holding of the land will be considered a single activity only if the income derived from farming exceeds the deductions attributable to the farming activity which are not directly attributable to the holding of the land (that is, deductions other than those directly attributable to the holding of the land such as interest on a mortgage secured by the land, annual property taxes attributable to the land and improvements, and depreciation of improvements to the land).

[31] Our analysis from here on in this *Discussion* Part VI will assume that Treasury Regulation § 1.183-1(d)(1) was found to be invalid and set aside. Of course, we make no actual determination regarding the validity of the regulation.

[32] The complete sentence petitioners cited reads: "As under present law, the loss would be determined separately with respect to each activity carried on by an individual." H.R. Rep. No. 91-413, pt. 1, at 71, 1969-3 C.B. at 245. There is no provided definition or standard for what constitutes a separate activity.

**[\*31]** In support, petitioners pointed to Treasury Regulation § 1.270-1(a)(4),[33] which provides, in relevant part:

> Where several business activities emanate from a single commodity, such as oil or gas or a tract of land, it does not necessarily follow that such activities are one business for the purposes of section 270. However, in order to be treated separately, it must be established that such business activities are actually conducted separately and are not closely interrelated with each other.

We reject petitioners' arguments set forth above for several reasons. First, Congress did not add any definition or standard for what constitutes a separate activity to section 183; outside of the title, the statute does not even use the plural "activities." Second, "[f]or those who consider legislative history relevant," *Warger v. Shauers*, 574 U.S. 40, 48 (2014), Congress did not provide any definition or standard for what constitutes a separate activity in the legislative history regarding section 183, *see supra* note 32. Finally, Treasury Regulation § 1.270-1(a)(4) has not applied since 1969, and the standard provided in that regulation does not strongly support petitioners' position in any case.

In the absence of statutory guidance, we turn to relevant caselaw. *See Loper Bright*, 144 S. Ct. at 2257–58, 2265–66 (stating that courts must say what the law is even when a statute is ambiguous or there is a statutory gap).

Petitioners have cited four Tax Court opinions in which farming and the holding of land were treated as one activity: *Thacker v. Commissioner*, T.C. Memo. 1969-276; *Sanderson v. Commissioner*, T.C. Memo. 1964-284; *Hillcone S.S. Co. v. Commissioner*, T.C. Memo. 1963-220; and *Blake v. Commissioner*, 38 B.T.A. 1457 (1938). However, in none of those cases did we consider whether (nor did either party contend that) the farming activities at issue were separate from the holding of land. These cases offer little to no support for petitioners'

---

[33] Enacted in 1954, section 270 disallowed certain deductions for trades or businesses which lost over $50,000 for each of five consecutive years. Internal Revenue Code of 1954, ch. 736, § 270, 68A Stat. 3, 81–82. Section 270 was based on prior section 130 enacted in 1943. *See* Revenue Act of 1943, ch. 63, § 129, 58 Stat. 21, 48–49. Section 270 was repealed in the Tax Reform Act of 1969, Pub. L. No. 91-172, § 213(b), 83 Stat. 487, 572. Neither section 270 nor Treasury Regulation § 1.270-1(a)(4) applies for taxable years beginning after December 31, 1969. Tax Reform Act of 1969, § 213(d), 83 Stat. at 572; Treas. Reg. § 1.270-1(f).

**[\*32]** position. Opinions that substantively address whether undertakings constitute one or multiple activities are far more relevant.

Whether undertakings constitute one or more activities is a question of fact. *See Patients Mut. Assistance Collective Corp. v. Commissioner*, 151 T.C. 176, 198 (2018) ("Whether two activities are two trades or businesses or only one is a question of fact." (first citing *Californians Helping to Alleviate Med. Probs., Inc. v. Commissioner*, 128 T.C. 173, 183 (2007); and then citing *Owens v. Commissioner*, T.C. Memo. 2017-157, at \*21)), *aff'd*, 995 F.3d 671 (9th Cir. 2021). This question of fact has arisen in several contexts other than section 183. *See, e.g.*, *Davis v. Commissioner*, 65 T.C. 1014 (1976) (§ 162); *Nielsen v. Commissioner*, 61 T.C. 311 (1973) (§ 355); *Lester v. Commissioner*, 40 T.C. 947 (1963) (§ 355); *Collins v. Commissioner*, 34 T.C. 592 (1960) (§ 130, 1939 Code); *Davis v. Commissioner*, 29 T.C. 878 (1958) (§ 130, 1939 Code); *Roselle v. Commissioner*, T.C. Memo. 1981-394, 1981 Tax Ct. Memo LEXIS 346 (§ 1348, 1969 Code); *Peterson Produce Co. v. United States*, 205 F. Supp. 229 (W.D. Ark. 1962) (§ 446(d)), *aff'd*, 313 F.2d 609 (8th Cir. 1963). In resolving such questions, courts have generally considered all facts and circumstances of a case. *See, e.g.*, *Roselle*, 1981 Tax Ct. Memo LEXIS 346, at \*17 (finding activities at issue were separate trades or businesses "[o]n the basis of the facts and circumstances herein"); *Davis*, 65 T.C. at 1020 (beginning analysis by stating "[w]hen we consider the facts of the case now before us"); *Nielsen*, 61 T.C. at 317 ("After careful consideration of all of the facts in the stipulated record, we are of the opinion that the operations [at issue] constituted two separate businesses."). Of course, particular factors have also been highlighted as relevant in determining whether undertakings constituted one or more activities in certain cases. In *Collins*, 34 T.C. at 596–98, we considered the organizational and economic interrelationship of two undertakings, finding that the undertakings were "separately and independently conducted." We also stated that "the fact that an individual carries on two or more enterprises which engage in identical or similar activities may be a factor suggesting that the enterprises are in reality a single trade or business." *Id.* at 597. We addressed arguments regarding similar factors in *Davis*, 29 T.C. at 887–92. In *Davis* we also explained that there were

[*33] "very good business reasons" for conducting the undertakings as separate activities.[34] *Id.* at 891.

On the basis of the caselaw discussed in the prior paragraph, we conclude that the determination of whether undertakings constitute one activity or multiple activities is to be based on all facts and circumstances of a case. We further conclude that the factors considered in *Collins* and *Davis* may be employed to assist a court in making such determinations. In addition, after the enactment of section 183 and the promulgation of Treasury Regulation § 1.183-1(d)(1), we have developed additional factors (not enumerated in the regulation) to assist us in ascertaining whether undertakings are single or multiple activities. These factors include (1) whether the undertakings were conducted at the same place, (2) whether the undertakings were part of the taxpayers' efforts to find sources of revenue from their land, (3) whether the undertakings were formed separately, (4) whether one undertaking benefited from another, (5) whether the taxpayers used one undertaking to advertise the other, (6) the degree to which the undertakings shared management, (7) the degree to which one caretaker oversaw the assets of multiple undertakings, (8) whether the same accountant was used for the undertakings, and (9) the degree to which the undertakings shared books and records. *See Topping v. Commissioner*, T.C. Memo. 2007-92, 2007 Tax Ct. Memo LEXIS 88, at *17–18 (citing *Mitchell v. Commissioner*, T.C. Memo. 2006-145, 2006 Tax Ct. Memo LEXIS 145). We find these commonsense caselaw factors to be helpful and would also employ them even if we were to find Treasury Regulation § 1.183-1(d)(1) to be invalid.

In *Schwarz I,* T.C. Memo. 2024-55, at *84–86, *94–100, when ascertaining whether the farming and land holding undertakings were single or multiple activities, we considered all facts and circumstances. We began our analysis by discussing the "case as a whole." *Id.* at *84–86.

---

[34] The three enumerated factors in Treasury Regulation § 1.183-1(d)(1) are based on factors considered in *Collins* and *Davis*, and we find the caselaw and regulation factors to be the same in substance. *See* John W. Lee, *A Blend of Old Wines in a New Wineskin: Section 183 and Beyond*, 29 Tax L. Rev. 347, 367 (1974). We note that the article states that "[t]he similarity test was clearly overruled in *Collins*." *Id.* That is incorrect; we explicitly stated that "engage[ment] in identical or similar activities may be a factor suggesting that" undertakings comprise one activity. *Collins*, 34 T.C. at 597.

[*34] We also discussed the *Collins/Davis*[35] and other factors (together, relevant factors). *Id.* at *94–100. However, there is a wrinkle with respect to our discussion of the relevant factors. Before discussing them, we considered the Treasury Regulation § 1.183-1(d)(1) farming and land test.[36] *Schwarz I*, T.C. Memo. 2024-55, at *86–93. Applying the farming and land test, we "ruled that TI's farming activity and LSLP's holding of 1,736 acres are separate activities." *Id.* at *94. Accordingly, we technically analyzed the relevant factors only with respect to "the remaining properties/real estate activities." *Id.*

Upon review and reconsideration of our discussion of the relevant factors, we conclude that our analysis would be unchanged by including the 1,736 acres. We note that the 1,736 acres were part of the 2,238-acre La Perla Ranch property, which we analyzed in our discussion of the relevant factors. Furthermore, to the extent our analysis pertained to properties/real estate activities in general, we find that the same analysis would apply if the 1,736 acres were included.

Having also reconsidered the facts and circumstances of this case as a whole, we again rule that the real estate activities and TI's farming activity were separate activities. We reiterate our analysis from *Schwarz I*, T.C. Memo. 2024-55, at *84–86. In short, petitioners and Affiliated Entities conducted one activity (or set of activities) that aimed to profit from the leasing and selling of real estate located throughout South Texas. This activity was highly profitable, chiefly because of petitioners' price-enhancing sales techniques and the strong market for rural land in South Texas that had appreciated at an average rate of 6% or more per year since the early 2000s. We emphasize that this is not a case in which taxpayers merely held land that they farmed. Rather, petitioners owned and controlled a series of entities that were engaged in extensive and sophisticated real estate operations involving numerous valuable properties spread over a large geographic area.

---

[35] In *Schwarz I* we identified the *Collins/Davis* factors as the Treasury Regulation § 1.183-1(d)(1) factors. As previously noted, the Treasury Regulation § 1.183-1(d)(1) factors and the *Collins/Davis* factors are the same in substance. *See supra* note 34.

[36] The farming and land test is not based on any caselaw that we have found, and we will not consider the test in this Supplemental Memorandum Opinion. No inference should be drawn from this regarding whether the farming and land test represents the best interpretation of section 183. *See Loper Bright*, 144 S. Ct. at 2266 (stating that if an agency's interpretation "is not the best, it is not permissible").

**[\*35]** TI conducted a separate farming activity, which was focused on ecotourism (mostly selling hunting, fishing, and event packages).[37] This activity was extremely unprofitable.[38] Although the ecotourism activity took place almost entirely on La Perla and Jalisco Ranches, benefits to the real estate activities from the ecotourism activity were minimal, certainly in comparison with the substantial ecotourism losses. As we stated, "[n]o competent real estate activity would have conducted staggeringly unprofitable ecotourism for such nominal benefits." *Id.* at \*86 n.104.

VII.    *Whether TI's Farming Activity Was Engaged In for Profit*

We next reconsider whether TI's farming activity was engaged in with the intent to make a profit. In section 183(c) Congress defined the term "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." After enactment of section 183, the Secretary issued Treasury Regulation § 1.183-2. Treasury Regulation § 1.183-2(a) provides, in part, that "[t]he determination whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case."[39] *See also Wann v. Commissioner*, T.C. Memo. 1968-246, 1968 Tax Ct. Memo LEXIS 52, at \*20 (stating that the for-profit determination "must be made upon the entire record").

Treasury Regulation § 1.183-2(b) reiterates that "[i]n determining whether an activity is engaged in for profit, all facts and circumstances with respect to the activity are to be taken into account." Treasury

---

[37] Although Affiliated Entities (and third parties) paid TI to complete custom farming work on various properties, we analyzed TI's financial records and found "that the large majority of TI's Schedule F losses were attributable to ecotourism (and work in support of ecotourism) which had little to no relationship to the real estate activities." *Schwarz I*, T.C. Memo. 2024-55, at \*84, \*56–58.

[38] TI reported Schedule F losses totaling over $15 million for 2005–20, over $11 million for 2010–20, and over $4 million for the years at issue. *Id.* at \*37. We found that "profit margins for ecotourism were abysmal," being "*far* less than negative 151% for years 2010–20" combined and significantly less than negative 200% for the years at issue combined. *Id.* at \*57.

[39] Treasury Regulation § 1.183-2 might not be perfectly internally consistent, depending on how one views the term "objective standards" as used in paragraph (a). *Compare* Treas. Reg. § 1.183-2(a) ("The determination whether an activity is engaged in for profit is to be made by reference to objective standards . . . ."), *with Nickerson v. Commissioner*, 700 F.2d 402, 404 (7th Cir. 1983) (describing the Treas. Reg. § 1.183-2(b) factors as "primarily objective"), *rev'g* T.C. Memo. 1981-321.

**[\*36]** Regulation § 1.183-2(b) also provides a list of nine "factors which should normally be taken into account" in making a for-profit determination. Those nine factors, which are "originally derived from court opinions,"[40] are: (1) the manner in which the taxpayer carries on the activity;[41] (2) the expertise of the taxpayer or the taxpayer's advisers;[42] (3) the time and effort expended by the taxpayer in carrying on the activity;[43] (4) the expectation that assets used in the activity may appreciate in value;[44] (5) the success of the taxpayer in carrying on other similar or dissimilar activities;[45] (6) the taxpayer's history of income or loss with respect to the activity;[46] (7) the amount of occasional profits, if any;[47] (8) the financial status of the taxpayer;[48] and (9) whether elements of personal pleasure or recreation are involved.[49] Most courts have relied on this summary of caselaw for decades. *See Westbrook v. Commissioner*, 68 F.3d at 876 ("Courts have consistently relied on these nine factors, originally derived from court opinions, to determine whether a profit motive exists for purposes of deduction of losses under §§ 162 and 212.").

Although Treasury Regulation § 1.183-2(b) provides that the nine factors "should normally be taken into account" in making for-profit

---

[40] *Westbrook v. Commissioner*, 68 F.3d 868, 876 (5th Cir. 1995), *aff'g per curiam* T.C. Memo. 1993-634; *see also Faulconer v. Commissioner*, 748 F.2d 890, 894–95 (4th Cir. 1984), *rev'g* T.C. Memo. 1983-165; *Eastman v. United States*, 225 Ct. Cl. 298, 305 (1980); *Jasionowski*, 66 T.C. at 321–22.

[41] *See Lamont v. Commissioner*, 339 F.2d 377, 379–80 (2d Cir. 1964), *aff'g* T.C. Memo. 1964-2; *Whitman v. United States*, 248 F. Supp. 845, 854–55 (W.D. La. 1965).

[42] *See Babbitt v. Commissioner*, 23 T.C. 850, 867 (1955); *Worrell v. United States*, 254 F. Supp. 992, 993, 995 (S.D. Tex. 1966).

[43] *See Wright v. Commissioner*, 31 T.C. 1264, 1267–68 (1959), *aff'd per curiam*, 274 F.2d 883 (6th Cir. 1960); *Mauller v. Commissioner*, T.C. Memo. 1966-146, 1966 Tax Ct. Memo LEXIS 139, at \*15–16.

[44] *See Blake*, 38 B.T.A. at 1460; *DuPont v. United States*, 234 F. Supp. 681, 688 (D. Del. 1964).

[45] *See Lowenthal v. Commissioner*, T.C. Memo. 1968-79, 1968 Tax Ct. Memo LEXIS 221, at \*22; *Vanderbilt v. Commissioner*, T.C. Memo. 1957-235, 1957 Tax Ct. Memo LEXIS 13, at \*16–17.

[46] *See Bessenyey*, 45 T.C. at 275; *Ellsworth v. Commissioner*, T.C. Memo. 1962-32, 1962 Tax Ct. Memo LEXIS 277, at \*19.

[47] *See Lamont v. Commissioner*, 339 F.2d at 379; *Demler v. Commissioner*, T.C. Memo. 1966-117, 1966 Tax Ct. Memo LEXIS 166, at \*22.

[48] *See Clark v. Commissioner*, T.C. Memo. 1969-241, 1969 Tax Ct. Memo LEXIS 53, at \*10; *Mauller*, 1966 Tax Ct. Memo LEXIS 139, at \*15.

[49] *See Bessenyey*, 45 T.C. at 275; *White v. Commissioner*, 23 T.C. 90, 95 (1954), *aff'd per curiam*, 227 F.2d 779 (6th Cir. 1955).

**[\*37]** determinations, courts have discretion to follow, add to, or disregard those factors as they see fit. *See Abramson v. Commissioner*, 86 T.C. 360, 371 (1986) ("[The regulation] factors are not applicable or appropriate for every case. The facts and circumstances of the case in issue remain the primary test."). Indeed, the U.S. Court of Appeals for the Seventh Circuit has called Treasury Regulation § 1.183-2(b) "a goofy regulation," and has chosen not to "wad[e] through the nine factors" but instead to take a more holistic approach. *Roberts v. Commissioner*, 820 F.3d 247, 250, 254 (7th Cir. 2016), *rev'g* T.C. Memo. 2014-74. On the other hand, the Fifth Circuit has stated that "IRS regulations provide that the profit-motive determination is an objective one made using a non-exhaustive list of nine factors . . . . This court likewise relies on those factors." *Vest v. Commissioner*, 690 F. App'x 210, 212–13 (5th Cir. 2017), *aff'g* T.C. Memo. 2016-187; *see also Westbrook v. Commissioner*, 68 F.3d at 877 ("[A] balancing of the nine factors and any other relevant consideration is the proper method for determining whether a profit motive exists.").

In *Schwarz I*, T.C. Memo. 2024-55, at \*112, we considered all nine Treasury Regulation § 1.183-2(b) factors and the facts of the case as a whole, concluding that the facts

> pertaining to TI's history of losses and lack of profits are the most significant. Year after year, TI's farming activity continued to lose money, and there is no indication it will ever be profitable. We believe that Dr. Schwarz was following his longtime passion for deer and ranch development and pursued this independently of any desire to earn a profit. Petitioners had money to do this, especially when they knew that the real estate market was strong. Considering all the facts and circumstances, we find that petitioners did not have an actual and honest profit objective. We hold that TI's farming activity was not engaged in with the intent to make a profit.

Even if Treasury Regulation § 1.183-2(b) was found to be invalid, we would consider the same factors based on caselaw predating issuance of the regulation, along with all relevant facts, and our conclusion would be unchanged.[50] *See Strode v. Commissioner*, T.C. Memo. 2015-117,

---

[50] Alternatively, our conclusion would be unchanged even if we disregarded the nine factors and instead employed either (1) the holistic approach espoused by the Seventh Circuit, *see Roberts v. Commissioner*, 820 F.3d at 250–54, or (2) the test

**[\*38]** at \*11 n.7 (recognizing that the Treasury Regulation § 1.183-2(b) factors represent a summary of applicable caselaw, and those factors would apply even if the regulation was invalid);[51] *see also Jasionowski*, 66 T.C. at 321 ("[S]ection 183(c) defines an 'activity not engaged in for profit' as an activity with respect to which deductions would not be allowable under section 162 or section 212(1) or (2). Thus, prior cases dealing with profit motive under these sections retain their vitality."). This is consistent with Fifth Circuit precedent recognizing that the Treasury Regulation § 1.183-2(b) factors are "derived from court

---

espoused by petitioners, *see supra* note 28. Under any approach, by far the most important facts relevant to the for-profit analysis in this case are TI's long history of substantial farming activity losses and lack of realistic possibility to earn future profits. *See Schwarz I*, T.C. Memo. 2024-55, at \*112; *see also Golanty v. Commissioner*, 72 T.C. 411, 427 (1979) ("A record of . . . large losses over . . . many years is persuasive evidence that the [taxpayer] did not expect to make a profit."), *aff'd*, 647 F.2d 170 (9th Cir. 1981) (unpublished table decision). We analyzed TI's financial information at great length throughout *Schwarz I*, concluding that "[y]ear after year, TI's farming activity continued to lose money, and there is no indication it will ever be profitable." *Schwarz I*, T.C. Memo. 2024-55, at \*112. We reiterate that statement.

[51] In *Strode*, we considered a challenge to the validity of Treasury Regulation § 1.183-2(b) under the (now overruled) *Chevron* standard. We stated that

> the regulation's list of factors purports to serve as no more than a guide. . . .
>
> Far from being arbitrary and capricious or contrary to law, the regulation reflects a reasonable construction of secs. 162, 183, and 212 and provides helpful guidance to taxpayers seeking to ascertain whether they may properly deduct expenses associated with a particular activity. In any event, the factors listed in the regulation were derived from caselaw, *see Allen v. Commissioner*, 72 T.C. 28, 33–34 (1979), so even if the regulation were invalid (which it is not), we would consider the very same factors in deciding whether petitioner had a profit motive.

*Strode*, T.C. Memo. 2015-117, at \*11 n.7.

In *Loper Bright*, the Supreme Court cautioned that by overruling *Chevron* it did "not call into question prior cases that relied on the *Chevron* framework. The holdings of those cases . . . are still subject to statutory *stare decisis* despite [the Supreme Court's] change in interpretive methodology." *Loper Bright*, 144 S. Ct. at 2273. The parties agree that the holding in *Strode* regarding the validity of Treasury Regulation § 1.183-2(b) is not entitled to stare decisis because *Strode* is a memorandum opinion. *See Newman v. Commissioner*, 68 T.C. 494, 502 n.4 (1977) (stating that memorandum opinions are "not controlling precedent"). However, *Strode* correctly holds that the Treasury Regulation § 1.183-2(b) factors represent a summary of applicable caselaw regarding whether an activity is conducted for profit.

**[*39]** opinions" and should be considered when "determining whether a profit motive exists." *Westbrook v. Commissioner*, 68 F.3d at 876–77.[52]

While our conclusion from *Schwarz I* remains unchanged, we slightly alter our analysis of one factor. In discussing the expectation that assets used in activity may appreciate in value factor, we included the following footnote:

> Even if we agreed that most real estate activities and TI's farming activity are part of the same activity, there is no guarantee that this factor would strongly favor petitioners. The [farming and land test] clearly precludes consideration of the 1,736 acres purchased by LSLP for investment in 2005 and never sold. This is the most valuable acreage owned by petitioners or Affiliated Entities since 2005. Excluding this acreage, using taxable gains (when available) for sold properties instead of gross gains, and correcting other errors that Dr. Hakala made, it strongly appears that TI's Schedule F losses from 2005 to the end of 2020 outweigh realized and unrealized gains in real property (using Mr. Swanson's valuations). Considering the strong real estate market and petitioners' price-enhancing sales techniques, that is a *shockingly* bad outcome for petitioners.
>
> We also note our caselaw holding that "[a]n unsuccessful farming operation cannot be carried on forever simply because the price of land in that general area is rising." *Boddy v. Commissioner*, T.C. Memo. 1984-156, 1984 Tax Ct. Memo LEXIS 514, at *22 n.6 (citing *Jasionowski*, 66 T.C. at 323), *aff'd*, 756 F.2d 884 (11th Cir. 1985) (unpublished table decision).

*Schwarz I*, T.C. Memo. 2024-55, at *105–06 n.116. Because we will not apply the farming and land test in this Supplemental Memorandum Opinion, we alter our analysis, which we will do in the remainder of this *Discussion* Part VII.

---

[52] The Fifth Circuit has chosen to employ the Treasury Regulation § 1.183-2(b) factors even though it has never been bound to do so. *See Roberts v. Commissioner*, 820 F.3d at 250–54 (noting that the regulation permits courts to "devise[ their] own test, with [their] own factors, as long as [they] explain[] why the [regulation] factors . . . [a]re insufficient").

[*40] There is little question that the real estate activities regarding properties other than La Perla and Jalisco Ranches were separate from TI's farming activity. *See id.* at *95–100 (discussing TI's farming operations on La Perla and Jalisco Ranches as compared to minimal operations on other properties). However, though we do not agree with it, petitioners' position that TI's farming activity and the real estate activities regarding La Perla and Jalisco Ranches are part of the same activity is stronger. *See id.* As we stated in *Schwarz I*, T.C. Memo. 2024-55, at *85, "[m]ost properties at issue had little or no connection to TI's farming activity. For the few properties that did have a significant connection (like La Perla and Jalisco Ranches), TI's farming activity was focused on ecotourism rather than developing real estate."

Even if we agreed with petitioners that TI's farming activity and the holding of La Perla and Jalisco Ranches were parts of the same activity, the outcome of this case would not change, for two reasons.

First, TI's farming activity losses far outweigh LSLP's unrealized property gains attributable to La Perla and Jalisco Ranches. As we discussed in *Schwarz I*, T.C. Memo. 2024-55, at *75, *80, Dr. Hakala estimated LSLP's unrealized gains as of December 31, 2017, in part by backdating certain of Mr. Swanson's October 31, 2022, property valuations. We stated that "it appears that $9 to $10 million [of Dr. Hakala's unrealized gains estimate] is attributable to La Perla and Jalisco Ranches." *Id.* at *80. However, we also discussed several problems in Dr. Hakala's analysis that would cause that estimate to decrease by an indeterminable but substantial amount.[53] *Id.* at *78, *80–82. Furthermore, in this Supplemental Memorandum Opinion we have analyzed Mr. Swanson's valuations of the La Perla HQ Tract and Jalisco Ranch and valued those properties at only $7.5 million and $3,335,000, respectively, as of October 31, 2022. Adjusting these valuations back to December 31, 2017 (using Dr. Hakala's backdating method, which is overly favorable to petitioners), would reduce them to approximately $6,123,000 and $2,723,000, respectively. These values

---

[53] We found that (1) a balance-sheet-related error regarding Jalisco Ranch would have reduced Dr. Hakala's estimate by $801,644, (2) a math error would have increased Dr. Hakala's estimate by $403,221, and (3) a failure to consider assets shown on TI's 2017 balance sheet would have reduced Dr. Hakala's estimate by an amount that could not be determined because of "a lack of specificity regarding assets shown on TI's 2017 depreciation schedule." *Schwarz I*, T.C. Memo. 2024-55, at *80–82. In addition, we discussed oddities regarding "Dr. Hakala's method for accounting for changes in real estate values over time" that were "advantageous for petitioners when calculating property values as of the end of 2017." *Id.* at *78.

[*41] are lower than the $7,630,992 and $3,890,197 December 31, 2017, valuations that Dr. Hakala determined for the La Perla HQ Tract and Jalisco Ranch by a combined amount of $2,675,189. All things considered, LSLP's unrealized property gains attributable to La Perla and Jalisco Ranches as of December 31, 2017, were substantially lower (by at least $3 million) than Dr. Hakala's $9 to $10 million estimate. LSLP's unrealized property gains attributable to La Perla and Jalisco Ranches were also far lower than TI's farming activity losses of over $12 million for years 2005–17.[54]

---

[54] Petitioners have asked us to consider the appreciation of La Perla and Jalisco Ranches going back to 2005. As we discussed in *Schwarz I*, TI conducted its farming activity primarily in Starr County until around 2010, while LSLP conducted most of the farming operations in Zapata County (and reported combined Schedule F losses for years 2008–12 of $2,714,992). *Id.* at *17–19, *65–66. We determined that a focus on years beginning with 2010 was most appropriate in this case. *Id.* at *66. While we lack the facts necessary to determine appreciation of La Perla and Jalisco Ranches during 2010–17 only, we note that the facts indicate that that value of those ranches substantially increased soon after Affiliated Entities purchased them in 2005 (i.e., before 2010). *See id.* at *14–15 (describing the purchase of 15,070 acres of land in Zapata County in 2005 for a low price, improvements made to the land, and sale of 11,972 acres by the end of 2006 at a price per acre 43% higher than the average price per acre paid for the 15,070 acres purchased in 2005). Considering the strong appreciation in property values in years before 2010, it appears that the appreciation of La Perla and Jalisco Ranches during 2010–17 was dwarfed by TI's farming activity losses of over $8 million for years 2010–17.

We also note that G. Morgan Capital Partners, Ltd. (GMCP), and/or LSLP sold 1294 acres constituting (what would later become) Jalisco Ranch and a portion of La Perla Ranch in 2005. *See id.* at *14–16. Evidence shows that these 1,294 acres were sold for a profit of about $554,000. LSLP bought back a portion of the acreage in May 2006 and GMCP bought back the remaining acreage in December 2006. *Id.* at *16. Given TI's work primarily in Starr County in 2005 and 2006, we see no reason to count the $554,000 profit against TI's farming activity losses. Even if we did, this relatively small gain would not affect our conclusion.

We further note that TI's farming activity losses of over $3.3 million for years 2018–20 far outpaced appreciation of La Perla and Jalisco Ranches during 2018–20. According to data Dr. Hakala used in backdating property values, Texas rural real estate valuations increased only 2.48% from December 31, 2017, to December 31, 2020. Using our property valuations as of October 31, 2022, and Dr. Hakala's backdating method, the La Perla HQ Tract, the Lone-Star Tract, and Jalisco Ranch combined were worth approximately $11 million as of the end of 2017. Applying a 2.48% increase results in property appreciation of approximately $275,000, i.e., less than 9% of TI's farming activity losses for years 2018–20.

In petitioners' favor, Texas rural real estate valuations increased by 19.52% during 2021. The amount of TI's farming activity profit or loss for 2021 was not established to be used as a comparison.

**[\*42]** Second, and building on the first reason, "[a]n overall profit is present if net earnings and appreciation are sufficient to recoup the losses sustained in the 'intervening years' between a given tax year and the time at which future profits were expected." *Helmick v. Commissioner*, T.C. Memo. 2009-220, 2009 Tax Ct. Memo LEXIS 222, at \*32 (quoting *Bessenyey*, 45 T.C. at 274); *see also Mathis v. Commissioner*, T.C. Memo. 2013-294, at \*12–13 (first citing *Foster v. Commissioner*, T.C. Memo. 2012-207; and then citing *Golanty*, 72 T.C. at 427–28). During the years at issue, there was no indication that TI's farming activity would ever be profitable, and TI's accumulated farming activity losses far exceeded LSLP's unrealized gains in La Perla and Jalisco Ranches. The evidence presented did not indicate that future appreciation of the ranches would exceed TI's future farming activity losses, much less recoup accumulated losses from any relevant intervening years. In fact, appreciation of La Perla and Jalisco Ranches over the three years 2018–20 offset less than 9% of the additional losses TI incurred in its farming activity during those years.[55] *See supra* note 54. In short, the evidence shows that a bona fide expectation to earn an overall profit did not exist during the years at issue.

VIII. *Conclusion*

We again hold that TI's farming activity was not engaged in for profit in the years at issue. Petitioners are not liable for accuracy-related penalties for the reasons discussed in *Schwarz I*. We have considered all arguments made by the parties, and to the extent not mentioned or addressed, they are irrelevant or without merit.

To reflect the foregoing,

*An appropriate order will be issued.*

---

[55] "Evidence from years outside the years in issue can be relevant if it provides context to evaluate the taxpayer's overall requisite profit motive." *Den Besten v. Commissioner*, T.C. Memo. 2019-154, at \*18; *cf.* § 6214(b). Nonetheless, "we look at the profit picture in respect of the years at issue in terms of prior actual and anticipated future operations as they appeared at those times; actual profits or losses in those and subsequent years have probative, although not determinative, significance in such evaluation." *Smith v. Commissioner*, T.C. Memo. 1993-140, 1993 Tax Ct. Memo LEXIS 138, at \*26.